**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

**At Cincinnati**


**DEBRA SCHWEIZER**                                              **Case No. 1:21-CV-742**

*Plaintiff,*

**v.**

**FORD MOTOR COMPANY, a Delaware**
**Corporation**

*Defendant.*


## CIVIL COMPLAINT WITH JURY DEMAND


1.  This case arises from Plaintiff Debra Schweizer's November 19, 2012 purchase of a new 2013 Ford Fiesta, Vehicle Identification Number 3FADP4BJ5DM153184 ("Vehicle").

2.  Plaintiff's Vehicle was one of many thousands of vehicles equipped with an unsafe and defective transmission known as the "DPS6 PowerShift Transmission" ("PowerShift Transmission" or "DPS6").[1]

3.  As a result of a myriad of defects plaguing the Vehicle, Ford Motor Company ("Ford") violated its statutory and common law warranty and disclosure obligations related to the Vehicle, which was subject to Ford warranties. Ford thereby breached its express and implied warranties, violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, violated the Consumer Sales Practices Act, Ohio Revised Code § 1345.01, *et seq.*, and committed fraud and concealment.

---

[1] Ford marketed and sold thousands of 2011-2016 Ford Fiesta motor vehicles and 2012-2016 Ford Focus motor vehicles equipped with the same defective DPS6 transmission globally.

4. Ford, either directly or through its authorized repair facilities, failed to repair Plaintiff's Vehicle to conform to Ford's written warranties after a reasonable number of opportunities or within a reasonable amount of time. Moreover, Ford failed to promptly replace Plaintiff's Vehicle or make restitution for the car. Plaintiff further alleges that the Vehicle was unmerchantable at the time of sale or lease, and unfit for it intended use, and thereby failed to conform to the representations on the Vehicle's label. Plaintiff also generally alleges that Ford concealed one or more known defects at the time of sale (and thereafter), and affirmatively misrepresented the Vehicle's qualities at the time of sale, thereby inducing Plaintiff into the purchase of the Vehicle.

5. The DPS6-equipped Ford Focus and Fiesta vehicles, including the Vehicle herein, was and is dangerous to consumers and the public at large, because the defective DPS6 could, and indeed does, cause such vehicles to lose power unexpectedly while driving (referred to as an "unintended neutral event" or "loss of motive power"); jerk and buck erratically, and otherwise fail in ways that reportedly could and did cause accidents and injuries (aforementioned problems collectively referred to as "Transmission Defects").

6. Ford knew prior to the initial launch of DPS6-equipped vehicles, which includes the subject vehicle, and at all times since, that the defects in the PowerShift Transmission rendered the Vehicle defective and dangerous.

7. Ford knew that such DPS6-equipped vehicles, which includes the subject Vehicle, did not and could not comply with Ford's warranty obligations or with Plaintiff's reasonable expectations.

8. Ford told one or more suppliers of DPS6 components that the DPS6 PowerShift Transmissions were dangerously defective and that said defect was irreparable; furthermore, Ford demanded that one or more suppliers compensate Ford for increased warranty costs related to the DPS6 nonconformities. Meanwhile, Ford continued to sell vehicles equipped with the DPS6 PowerShift Transmission to consumers.

9. Ford and its suppliers ultimately entered into one or more secret agreements, negotiated at the highest levels of Ford's management, whereby the supplier(s) paid Ford hundreds of millions of dollars for increased warranty costs that Ford incurred due to the DPS6 defects. Despite the payoff Ford received, Ford fraudulently concealed the known defects with the DPS6 from third-parties in the United States (*e.g.*, consumers including Plaintiff, governmental regulators such as the U.S. National Highway Safety Administration ("NHTSA")) and abroad (*e.g.,* the Australian Consumer and Competition Commission ("ACCC")).

10. Ford affirmatively misrepresented to Plaintiff, consumers and regulators that the DPS6's aberrant operations were "normal operating characteristics" and that there was nothing wrong with the transmission, consistent with Ford's secret settlement deal.

11. Despite Ford's admissions in a consent decree in a regulatory proceeding by the ACCC, which is part of the public record of that Australian regulatory agency, and which resulted in Ford paying a (AUS) $10 million penalty/fine for engaging in unconscionable conduct regarding DPS6-equipped Focus and Fiesta vehicles, Ford continues to deny the defects in the DPS6-equipped Focus and Fiesta vehicles. *See* https://www.accc.gov.au/media-release/court-orders-ford-to-pay-10-million-penalty-for-unconscionable-conduct (last visited November 18, 2021).

12. Ford's corporate misconduct and fraud is alleged in greater detail *infra*, with specific references to, and quotations from, Ford's own internal corporate documents, *inter alia.*

## RELEVANT PROCEDURAL HISTORY

13. This case arises from a consolidated case filed in April 2017 in the Wayne Circuit Court in Michigan. The case was styled *Cyr, et al. v. Ford Motor Company,* Case No. 2017-006058-NZ.

14. The *Cyr* plaintiffs were among over 12,000 named plaintiffs, who filed approximately 83 actions in the Wayne Circuit Court after opting out of a nationwide class action settlement against

Ford, *Vargas v Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx).

15.  Both *Cyr* and *Vargas* allege the same Transmission Defects complained of herein.

16.  In February 2018, Ford filed a motion seeking summary judgment of, *inter alia,* the Michigan Consumer Protection Act claims and dismissal of the nonresident Plaintiff's claims under the doctrine of forum non conveniens. Ford argued that resolution of the non-Michigan Plaintiff's claims should be handled in their home jurisdictions, not Michigan. The Wayne Circuit Court denied Ford's motion.

17.  In November 2018, the Michigan Court of Appeals granted Ford leave to appeal. *Cyr, et al. v. Ford Motor Company,* Case Appeal No. 345751. On December 26, 2019, the Michigan Court of appeals reversed the lower court's holding.

18.  In February 2020, Plaintiff filed an application for leave to appeal the appellate decision with the Michigan Supreme Court, which was denied on November 4, 2020.

19.  In November 2020, the Plaintiff moved the Michigan Supreme Court for reconsideration. On July 16, 2021, that request was denied.

20.  Plaintiff now bring this case in accordance with the Order of the Michigan Court of Appeals.

21.  Plaintiff anticipate this case will be promptly transferred to the pending Multidistrict Litigation, *In re: Ford Motor Co. DPS6 Powershift Transmission Products Liability Litigation,* MDL No. 2814 pursuant to 28 U.S.C. § 1407, which will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. The actions in MDL No. 2814 involve common factual questions arising out of allegations that the DPS6 PowerShift transmission installed in certain Ford Fiesta and Ford Focus vehicles is defective and negatively affects the drivability, safety, and useful life of the vehicles. *See In re Ford Motor Co. DPS6 PowerShift Transmission Prods. Liab. Litig.,* 289 F. Supp. 3d 1350, 1352-53 (J.P.M.L. 2018).

## JURISDICTION, JOINDER AND VENUE

22. Plaintiff purchased the Vehicle from Cronin Ford, an authorized Ford dealership located in Harrison, Ohio.

23. The Vehicle was presented to Ford's authorized repair dealerships related to the Transmission Defects within the state of Ohio, as set forth *infra*.

24. This Court has original jurisdiction to hear this case by virtue of 15 U.S.C. § 2310(d)(1)(A), the Magnuson-Moss Warranty Act, conferred under 28 U.S.C. § 1131.

25. Ford is a corporation organized and in existence under the laws of the State of Delaware with its principal offices located in the City of Dearborn, Wayne County, Michigan.

26. Ford was and at all times relevant has been, engaged in the marketing, distributing, selling, and leasing motor vehicles in the state of Ohio.

27. Ford is registered to do business in the state of Ohio.

28. Venue is proper in this District because Ford conducts business in this district.

## PARTIES AND FACTS

29. Plaintiff, Debra Schweizer, is, and at all times relevant has been, a resident of Harrison, Ohio in Hamilton County.

30. On November 19, 2012, Plaintiff purchased the Vehicle.

31. The Vehicle was designed, manufactured, constructed, assembled, marketed, distributed, sold and/or imported by Ford.

32. In connection with the purchase of the Vehicle, Plaintiff received from Ford an express written warranty. In said warranty Ford warranted it would preserve or maintain the utility or performance of the Vehicle or provide compensation if there is a failure in utility or performance for a specified period. The warranty provided, in relevant part, that in the event a defect developed with the Vehicle during the warranty period, the owner could deliver the vehicle for repair services to a

Ford authorized repair dealership and the vehicle would be repaired.

33. Because of the widespread known Transmission Defects, Ford also extended warranty coverage for specific transmission components. These extended warranties include, *inter alia,* in July 2014, the 14M01 warranty covering the clutch, with a scope of 7 years and 100,000 miles; and another in February 2015, the 14M02 warranty covering the Transmission Control Module ("TCM"), with a scope of 10 years and 150,000 miles.

34. The Vehicle was, and is, equipped with a DPS6 Transmission.

35. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty, and developed other serious defects and nonconformities to warranty including, but not limited to, transmission problems that caused the Vehicle to malfunction in the manner detailed herein.

36. The Ford window sticker on the Vehicle stated that the Vehicle had a "6 SPD AUTO TRANS."

37. Based on the representations made by Ford and Ford's authorized dealerships, Plaintiff reasonably believed the Vehicle was equipped with an automatic transmission that would shift smoothly, and was safe – as opposed to a vehicle that had Transmission Defects, and that would suffer from any of the results of those Defects specified above, *e.g.,* unintended neutral events, consistent slipping, bucking, kicking, jerking, harsh engagement, premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration, difficulty in stopping the vehicle, and premature transmission failure.

38. During, before or following the purchase of the Vehicle, Plaintiff was not informed by any Ford salesperson or Ford representative, nor did Ford otherwise disclose in any manner to Plaintiff, that the Vehicle was not actually equipped with an automatic transmission or that it suffered from the Transmission Defects by the very nature of its design and manufacture.

39. At no point before Plaintiff purchased the Vehicle did Ford or its authorized agents publicly or privately disclose to any plaintiff, any information about the Transmission Defects.

40. Ford's omissions were material to Plaintiff's decisions to purchase the Vehicle. Had Ford or its authorized agents publicly or privately disclosed the Transmission Defects before Plaintiff purchased the Vehicle, Plaintiff would have been aware of such disclosures, and would not have purchased the Vehicle.

41. In deciding to purchase the Vehicle, Plaintiff relied on said representations and non-disclosures, and on Ford's reputation as an established and experienced automobile manufacturer that would not misrepresent the qualities of the Vehicle's transmission.

42. In deciding to purchase the Vehicle, Plaintiff relied on Ford's representations and non-disclosures, and believed that Ford would not sell dangerous automobiles to consumers such as Plaintiff.

43. But for Plaintiff's reasonable reliance upon Ford's representations and non-disclosures, Plaintiff would not have purchased the Vehicle.

44. The DPS6 Transmission is defective, and causes sudden acceleration, delayed acceleration, hesitation on acceleration, difficulty stopping the vehicle, jerking, bucking and kicking, shuddering on acceleration, lack of power, delayed downshifts, slipping of gears while driving, transmission fluid leaks, and/or premature wear of the internal components of the Vehicle.

45. Within the time and mileage parameters of the express warranties that accompanied Plaintiff's Vehicle, Plaintiff presented the Vehicle to Ford's authorized repair facilities and dealerships for diagnosis and repair of Transmission Defects, as follows:

   a. On September 24, 2013, ten months after Plaintiff's purchase, the vehicle went into the Cronin Ford repair facility for 23 days, at only 18,541 miles.. The repair order noted complaints that something was wrong with the transmission, including problems

accelerating from a stop and noise. The Ford dealership verified the complaints and noted the transmission was slipping and shuddering. The car underwent a complete replacement of the clutch and seals, as well as various software updates.

b.  On April 3, 2015, Plaintiff presented the Vehicle to Cronin Ford again. The odometer read 51,834 miles at this time. The complaints included hesitation, failure to accelerate and a lack of motive power. The Ford dealership verified the clutch had failed again, and advised Plaintiff would have to return for a clutch replacement, which was scheduled for April 17.

c.  On June 24, 2015, the car was taken back to Cronin Ford with 57,951miles on the odometer. Plaintiff advised of the same transmission concerns. The concerns of excessive shuddering were again verified, and the clutch was seals were replaced again.

d.  On October 3, 2015 the car was presented to Cronin Ford again. This time, the TCM was reprogrammed per Ford's recall.

e.  On January 18, 2016, the car was taken back with the same complaints of excessive shuddering when accelerating. The problems were verified again, and a new clutch was ordered. Notably, the parts were often on backorder due to the widespread nature of the DPS6 Transmission Defects and resulting clutch failures. At this time, the representative at Cronin Ford also told Plaintiff that Ford was still directly its repair facilities to install "the same old clutches, no new clutch or remedy has been created.

f.  On April 19, 2016 Plaintiff returned the Vehicle to Cronin Ford for the clutch replacement ordered three months earlier.

g.  On February 3, 2017 through February 6, 2017, the car was again presented to Cronin Ford with complaints of shuddering and slipping of the transmission. While the Ford dealership confirmed the shudder, it was measured at 208 RPM. Because it didn't meet or exceed the artificial number created by Ford – 250 – nothing was done pursuant Ford's

policy of what it would force owners of the DPS6-equipped cars to tolerate.

h. On February 15, 2017 the car returned to Cronin Ford, where it remained until March 1, 2017. Because the car had just been checked on February 3, 2017, Ford considered the testing performed at this visit to a "good will gesture." The RPM was recorded at 477 RPM. As a result, the car underwent yet another clutch replacement.

46. Ford authorized and controlled the actions and omissions of its repair facilities and dealerships. Under the theories of agency and *respondeat superior*, Ford is liable for the actions and inactions of its authorized repair facilities and dealerships.

47. All repair attempts performed by the Ford repair facilities and dealerships were unresolved because the Transmission Defects were and are irreparable.

48. All acts of corporate employees, including Ford's repair facilities and dealerships, as alleged were authorized or ratified by an officer, director or managing agent of the corporate employer, Ford.

49. Following the return of the Vehicle to Plaintiff by Ford's repair facilities and dealerships after the service attempts to the Vehicle's Transmission Defects, Plaintiff believed the Ford representatives' representations that the Vehicle had been repaired and/or was safe to drive; Plaintiff's reliance on these representations was reasonable.

50. All repairs to the Vehicle set forth herein were covered under Ford's written warranty.

51. Ford knew about and concealed from Plaintiff the Transmission Defects present in the Vehicle, along with the Transmission Defects' attendant dangerous safety and drivability problems; said knowledge and concealment existed at the time of sale, repair, and thereafter. In fact, instead of repairing the Transmission Defects, Ford either refused to acknowledge their existence, or performed superficial and ineffectual software updates that simply masked the symptoms of the Transmission Defects.

52. Ford disseminated false information to its authorized Ford's repair facilities and dealerships

and to prospective purchasers, falsely claiming that the defective DPS6 Transmission functioned "normally." Ford disseminated this and other false information to discourage repair and service attempts related to the Transmission Defects in an effort to foreclose consumers in this state of consumer protection laws designed to protect them.

53. Upon information and belief, Ford has superior access to Plaintiff's Vehicle's warranty and warranty repair history.

54. Plaintiff's Vehicle was subject to the applicable Ford warranties at the time of any repair attempts made by the Ford's repair facilities and dealerships related to the Transmission Defects giving rise to this action.

55. Notwithstanding repair visits and opportunities to repair this Vehicle by the Ford's repair facilities and dealerships, the transmission problems with the Vehicle have never been fixed by Ford's authorized repair facilities, and the Transmission Defects continue to plague Plaintiff's Vehicle.

56. The Vehicle's acceleration, jerking, shuddering and other problems experienced by Plaintiff, as described in detail *infra*, are consistent to the DPS6 transmission problems.

57. Ford and its agents never disclosed to Plaintiff, at the time of sale or thereafter, any of the Transmission Defects Ford knew to exist.

58. As a result of Ford's inaction and silence, Plaintiff was completely unaware that the Vehicle was unsafe and unreliable.

59. As a reasonable person, Plaintiff would consider the Transmission Defects important, and would not have purchased a vehicle equipped with the DPS6 Transmission if the defects had been disclosed in advance.

60. Plaintiff hereby revokes acceptance of the respective sales contract related to the Vehicle.

## OVERVIEW OF THE DESIGN AND OPERATION OF THE DPS6

61. Ford introduced the DPS6 in its Fiesta and Focus vehicles for the 2011 and 2012 model years,

respectively.

62. Plaintiff's Vehicle was manufactured by Ford and delivered to Plaintiff equipped with the DPS6. Ford offered the PowerShift Transmission as the sole "automatic transmission" option in Plaintiff's vehicle.

63. With Ford's input, the DPS6 was designed by Getrag, a German transmission manufacturer. Getrag worked in concert with LuK, a German manufacturer of clutch components. The parts were supplied to Ford for incorporation as original equipment into DPS6-equippped Ford Focus and Fiesta vehicles. According to Ford, the DPS6 was supposed to provide uninterrupted torque from "twin internal clutches to keep changes among its six forward gears smooth and seamless, automatically. One clutch supports the uneven gearset, one, three and five; while the other clutch controls the even gears, two, four and six. The powertrain control unit that electronically integrates and harmonizes engine and DPS PowerShift automatic transmission operation always keeps the engine in peak efficiency range. In conjunction with six optimally spaced gears, DPS6 increases smoothness between gears, without engine torque falling off."

64. The DPS6 is neither a traditional manual transmission, nor a typical automatic transmission, but rather is a computerized "automated manual" transmission.

65. Traditional manual transmissions use a driver-controlled clutch. By pressing and releasing a foot pedal, the driver causes the clutch to mechanically engage and disengage the engine from the transmission, allowing the vehicle to travel continuously while the driver manually changes gears. The clutch in a traditional manual transmission is a "dry clutch," incorporating at least one clutch disc, which is covered with a friction material (asbestos, carbon fibers). The clutch disc is fixed to the input shaft of the transmission's gearbox. When the friction material on the face of the clutch disc is pressed against the engine's rotating flywheel (which is done with a "pressure plate" utilizing strong springs), the clutch disc "locks onto" the flywheel with tremendous force, allowing the engine's flywheel to

11

turn the transmission's input shaft with virtually no slippage or friction loss. Because a dry clutch allows for transfer of virtually all the engine's power to the transmission without friction losses, a properly designed and operating manual transmission is highly fuel-efficient. However, operation of a manual transmission can be difficult for less experienced drivers and can result in the vehicle jerking or shuddering during improper operation. Consequently, manual transmissions are disfavored by some consumers. Moreover, the dry clutch will fail to operate properly if the friction material is contaminated by oil from either the engine or the transmission's gearbox.

66. Traditional manual transmissions are characterized by gear ratios that are selectable by locking selected gear pairs to the output shaft within the gearbox. All gears within the gearbox are and must remain lubricated by oil. The gears are arranged on parallel shafts: the input shaft, which is driven by the engine's rotation power transferred by the clutch as discussed above, must be sealed to prevent gearbox oil from contaminating the dry clutch. The output shaft transmits rotation power out to the vehicle's wheels. Sometimes a different shaft, known as a countershaft or layshaft, is arranged in parallel alongside the output shaft; in those applications, the layshaft is turned by the input shaft and from there, essentially serves as the input shaft for purposes of the gear arrangements and engagements with gears on the output shaft. The input shaft, or layshaft, and its gears generally rotate at the same speed as the engine when the clutch disc is pressed to the flywheel. Each input shaft gear is enmeshed with companion gears on the output shaft; the gears slide along the shafts, when selected by the driver using the shift lever, to achieve different overall gear ratios for launching from a standstill, lower speeds, higher speeds, etc. However, because the various pairs of gear sets are not always engaged with each other, shifting requires the gear speeds to be precisely synchronized and can result in difficult gear engagements, particularly for inexperienced drivers or with worn gear sets or worn synchronizers.

67. In contrast, typical automatic transmissions free the driver from operating the dry clutch using

12

a fluid-filled device called a torque converter. The torque converter is a fluid coupling, in which two turbines oppose each other within a sealed fluid-filled container. The engine is connected to one turbine and the transmission's input shaft is connected to the other. When the engine rotates its turbine, the moving and pressurized fluid rotates the opposite turbine causing power to be transferred to the transmission's input shaft. Thus, the torque converter substitutes for a dry clutch, transmitting power from the engine to the transmission's input shaft through a fluid medium rather than direct mechanical engagement to the flywheel.

68. Conventional automatic transmissions are characterized by more complicated "planetary gear sets," rather than the parallel gears on shafts as in a typical manual. The conventional automatic transmission's gearbox contains an input shaft with gears (known as "sun gears") that are surrounded by three or four smaller gears (known as "planetary gears"). The planetary gears are held in position relative to each other by a brace (known as a "carrier"). The planetary gears surround and are enmeshed with the sun gear. Meanwhile, the set of planetary gears is itself surrounded by (and each planetary gear is enmeshed with) an outer ring gear. If the sun gear is rotated and the ring gear held stationary, the planetary gears rotate in an orbit around the sun gear, thereby turning the carrier (and anything connected to the carrier). If the sun gear is rotated and the planetary carrier held stationary, the ring gear (and anything connected to that) will rotate around the entire assembly. The arrangements of sun, ring, and planetary gears are moved hydraulically forward and backward along the input shaft, and the different components variously allowed to spin or held stationary, to result in various overall gear ratios. As a result of this arrangement, the gear shifts are typically smoother than (because the sun, planetary, and ring gears are constantly engaged with each other).

69. Automatic transmissions offer increased comfort and convenience to drivers because the torque converter's fluid coupling transmits power from the engine to the transmission smoothly and predictably, and because the planetary gear arrangement is more stable and smoother in its operation.

Also, there is no need to keep any friction surfaces "dry" or separate from the lubricating transmission fluid. However, conventional automatics are generally less fuel efficient than manual transmissions because the torque converter transfers power through fluid less efficiently than a mechanical dry clutch, and a conventional automatic's hydraulic shifts are not as "positive" as a manual transmission's shifts.

70.   Ford utilizes and has always utilized manual transmissions featuring a dry clutch as described above and featuring a gearbox housing input and output gears on parallel input and output shafts.

71.   Ford has never, in any instance, equipped any Ford vehicle for sale to the public with a manual transmission that used any different general type of clutch, nor any different general type of gearbox.

72.   Plaintiff are informed and believe, and therefore allege, that Ford utilizes, and at all times prior to 2010 had always utilized, automatic transmissions featuring a torque converter to provide a fluid coupling as described above, and featuring a gearbox housing planetary gear sets as described above, with a few notable exceptions: the continuously variable transmission (CVT) recently developed and used in some Ford vehicles; the dual-dry-clutch transmission used in the $200,000+ Ford GT; the dual-wet-clutch transmission used in some models in the European market; and the DPS6 "automatic" transmission used in Plaintiff's Vehicle.

73.   Ford has never, in any other instance, equipped any Ford vehicle for sale to the public with an "automatic" transmission that used any different general type of power coupling, nor any different general type of gearbox.

74.   Ford marketed and sold its DPS6 Transmission as an automatic transmission that offered the "best of both worlds" combining a manual transmission's fuel economy with an automatic transmission's ease of operation and shift quality.

75.   Ford's DPS6, while sometimes referred to as an automatic, is a set of computerized manual transmissions. It lacks a torque converter, instead using two clutches to mechanically engage and

14

disengage the engine and transmission. Whereas similar "automated manual" transmissions on the market use "wet" clutches bathed in oil, Ford's DPS6 clutches lack the oil pumps and other components of a wet clutch system, and instead operate "dry."

76. Ford incorporated the DPS6 into Fiesta and Focus vehicles to meet heightened governmental and consumer expectations for fuel economy, performance, convenience, and efficiency. Ford designed and marketed its DPS6 Transmission as a more advanced and fuel-efficient automatic transmission. According to Ford's press release dated March 10, 2010, "PowerShift with dry-clutch facings and new energy-saving electromechanical actuation for clutches and gear shifts saves weight, improves efficiency, increases smoothness, adds durability and is sealed with low-friction gear lubricant for the life of the vehicle. The transmission requires no regular maintenance."

77. In theory, a computer-controlled, automated manual transmission may provide the convenience of an automatic transmission without sacrificing the fuel efficiency and shift speed of a manual transmission. In practice, however, Ford's PowerShift Transmission is plagued by numerous problems and safety concerns.

**THE DPS6 DEFECTS**

78. The DPS6 is defective because it suffers from the following safety-related mechanical and electronic failures, which arose following the initial launch of the transmission in late 2010 (for the 2011 MY Fiesta) and continued throughout the next six-years: Wet Clutch" Shudder Attributed to Leaking Input Shaft Seals, Mechatronic Actuation Module (MAM) Failures, "Dry" Clutch Shudder, Software Calibration Issues.

79. These Transmission Defects, individually or collectively, caused the following "symptoms" in the DPS6's performance: constant gear slipping, bucking, kicking, jerking, harsh engagement, premature internal wear, sudden acceleration, delayed downshifts, delayed acceleration, difficulty stopping the vehicle, and, eventually, premature transmission failures.

80. Such Transmission Defects that cause passenger vehicles to jerk, buck, suddenly lurch forward, delay acceleration, delay deceleration, and/or suddenly lose forward propulsion present a safety hazard – particularly when they occur without warning – because they severely compromise the driver's ability to control the car's speed, position, acceleration (including from a stop), and deceleration.

81. For example, these conditions make it difficult to safely merge into traffic. Even more troubling, the Transmission Defects can cause the Vehicle to fail to downshift and decelerate, but instead continue to transfer power to the transmission and even surge the engine's RPMs, even when the brakes are depressed. As a result, drivers of vehicles equipped with the DPS6 have reported their vehicles lurching forward into intersections and at red lights, despite applying their brakes to stop the car.

82. The Transmission Defects also cause premature wear to the DPS6's clutch plates and other internal components, which results in premature transmission failure and requires expensive repairs, including premature clutch, TCM and transmission replacement.

83. Almost immediately after it began selling DPS6-equipped vehicles, Ford began receiving complaints and other information that the DPS6 Transmission was not working properly or "as advertised." For example, in a 2011 New York Times review of the Ford Focus, the reviewer stated that "Ford programmed the PowerShift Dual-clutch transmission to change gears in odd and infuriating ways" and that "[t]he transmission is often in the wrong gear at the wrong time, resulting in jerks, pauses and lethargic acceleration."

84. In response to these criticisms, Greg Burgess, an engineer at Ford, conceded in the same New York Times article that "[i]t is quite a challenge to deliver something that is very, very fuel efficient and yet feels like a conventional automatic, and there are some balances and some trade-offs that we make."

85. In response to complaints about the Transmission Defects, in 2010 and 2011, Ford issued multiple Technical Service Bulletins ("TSBs") to its dealers and authorized repair facilities acknowledging defects in the DPS6. Ford's TSB from September 2010, covering the 2011 Ford Fiesta, informed dealers and service personnel of "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or check engine light with transmission control module (CM) diagnostic trouble code…"

86. Similarly, Ford's TSB released on January 1, 2011, covering the 2011 Ford Fiesta with the DPS6 Transmission, informs dealers and service personnel of problems with the DPS6 Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."

87. Ford's TSB from March 31, 2011 also covering the 2011 Ford Fiesta, informs dealers of problems where the DPS Transmission "exhibit[s] a rattle/grind noise in reverse only."

88. Ford issued two separate TSBs in May 2011, both covering the Ford Fiesta. These TSBs addressed problems with the DPS6 including "concerns in Drive or Reverse when shifting from Park to Drive or reverse, no engagement, delayed engagement, intermittent engagement, noise during engagement…"

89. Another Ford TSB released in September 2011 advised dealers to reprogram the transmission computer if 2011 Ford Fiesta owners complained about "hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in or tip-out maneuvers and/or engine r. p.m. flare when coasting to a stop."

90. The 2012 Ford Focus was the subject of a September 2011 Ford TSB, which informed dealers and service personnel of transmission problems including: "RPM flare on deceleration coming to a stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations at a stop, intermittent vehicle speed control inoperative, intermittent harsh engagement/shift…"

91. In May of 2012, Ford issued a "Customer Satisfaction Program: Program Number 12B37." In a letter sent to 2012 Ford Focus drivers, Ford indicated that drivers "may experience rough or jerky automatic transmission shifts. In addition, the vehicle may experience roll back when the driver is transitioning from the brake pedal to the accelerator pedal while on a slight incline." Ford, however, did not issue a recall and did not warn drivers of the safety risks associated with these known problems –even though, as alleged below, Ford was obligated to so do.

### FORD KNEW ITS DPS6 POWERSHIFT TRANSMISSION WAS DEFECTIVE AND UNSAFE EVEN BEFORE IT SOLD THE VEHICLE TO PLAINTIFF

92. Prior to the DPS6's introduction into the marketplace, Ford determined that a component failure that led to an "unintended neutral" – *i.e.,* a loss of motive power – was assessed as the highest severity risk factor on its Failure Mode and Effects Analysis (FMEA).

93. Ford made this FMEA determination by employing a standard risk-assessment technique to determine the myriad ways this dual dry-clutch transmission might fail, the likelihood of such failures, and the severity of the consequences.

94. The FMEA process, which Ford itself helped pioneer, ranks the severity of component failures on a ten- point scale, with the high end of the scale denoting the most severe failures.[2]

95. Specifically, a rank of "10" means a failure mode that is "hazardous without warning," described as "very high severity ranking when a potential Failure Mode affects safe vehicle operation and/or involves noncompliance with government regulation without warning."[3]

96. A rank of "9" means a mode that is "hazardous with warning," also described as "very high severity ranking when a potential high failure mode affects safe vehicle operation and/or or involves noncompliance with government regulation with warning."[4]

---

[2] Failure Modes and Effects Analysis, Ford FMEA Handbook, version 4.2; pg. 1-4, 3-33; December 2011
[3] VGS 20346048, Severity 10 TCU Connector Not Error Proofed; Greg Goodall; October 3, 2008.
[4] VGS 20346048, Severity 10 TCU Connector Not Error Proofed; Greg Goodall; October 3, 2008.

97. Failure modes with high severity ranks must be designed out of the product, or have robust countermeasures designed into the product, or (if, despite the former two, they occur in the field) lead to a recall.

98. Ford and Getrag engineers identified a number of failure modes in the DPS6 that could result in "Unintended Neutral Events" – meaning the transmission would disengage the gears and slip into the neutral position, even though the driver had selected a drive gear and the gear shift lever remained in the driver selected position, and regardless of the vehicle's speed. Such Unintended Neutral Events resulted in the vehicle losing drive/motive power from the engine, which poses a safety hazard for a number of reasons, including, *inter alia,* the risk of collision; the driver's inability to drive the vehicle out of dangerous traffic; and the risk to occupants when stranded in high speed road conditions. Moreover, government regulations require transmissions to provide engine braking during deceleration, which is nonexistent during an Unintended Neutral Event.

99. During 2007 and 2008, Ford and Getrag argued as to how such an unintended neutral event should be rated/classified as a safety issue. In these arguments, Ford corporate officials, including Ford's Office of the General Counsel (OGC), argued that a failure mode that led to an unintended neutral event should be ranked as the highest or most severe safety type of safety problem, referred to as a Severity Level 10 ("SEV 10").

100. On February 20, 2008, Mr. Kirchhoffer and Joe Wickenheiser (a Ford "Small Car External Investigations and TREAD Reporting Manager") shared an Audi recall involving a "competitive Electro-hydraulic clutch actuator" in which a small number of 2004 Audi TT models had a safety defect that could lead to degraded clutch performance: "The clutch could lose its ability to provide torque to the transmission without a prior warning, which could allow the vehicle to roll,

increasing the risk of a crash."[5] Mr. Kirchhoffer noted in response: "This info is very helpful with respect to 'Unintended Neutral.' This is exactly the same event we are trying to avoid occurring to the customer. As a benchmark to be cascaded to the team – very helpful. It reinforced the effort to keep SEV=10 and drive the detection on manufacturing to level =1 to avoid this happening – much appreciated."[6]

101.      Further, Dave Garrett, a Ford Campaign Prevention Specialist, opined to the Ford/Getrag team that "[i]n practice, I urge engineers to increase the FMEA severity to 10, for any failure mode that has caused a previous Safety or Emission related recall."[7]

102.      As detailed, *infra*, Ford has issued safety recalls on other vehicle models for failure modes that caused a stall or loss of motive power event, including in circumstances when the driver was forewarned.

103.      Despite the stated concerns of its Office of General Counsel, Vehicle Safety Office, and Quality Technical Specialists, Ford's "senior management team" chose to adopt Getrag's position and ultimately rated the Unintended Neutral failure mode as merely a SEV "8."

104.      For example, on September 25, 2008, Mr. Kirchhoffer wrote an internal email to Ford's DPS6 team entitled, "Unintended Neutral Severity Rating: Clear Direction," in which he explained that "[p]er direction from our senior management team please be advised that: 1) The Unintended Neutral Event shall be renamed to 'Loss of Drive'; 2) The SEV Classification is confirmed to SEV = 8…."

**AFTER BEGINNING TO SELL DPS6-EQUIPPED VEHICLES, FORD RECEIVED ADDITIONAL INFORMATION THAT THE TRANSMISSION DEFECTS WERE DANGEROUS, REPORTEDLY CAUSING ACCIDENTS & INJURIES**

---

[5] VGS20386981; RE:Audi VOQ.xls; Johann Kirchhoffer; Ford Motor Company; February 20, 2008.
[6] VGS20386981; RE:Audi VOQ.xls; Johann Kirchhoffer; Ford Motor Company; February 20, 2008.
[7] VGS7-0058850; Ford Severity Classification; David Garrett; Ford Motor Company; June 15, 2007.

105.     The unintended neutral failure events plagued the DPS6-equipped vehicles, and these safety defects continue to this day. For example, on February 22, 2011 (after the launch of the Fiesta and in preparation for the launch of the Focus), DPS6 Transmission Systems Engineer, Tom Hamm, wrote an email to Ford engineers David Lempke and Piero Aversa regarding the upcoming 2012 Focus vehicle. Mr. Hamm stated, "Please tell me we are not going to launch this vehicle with the same issue we have on the Feista [sic]?"

106.     Customers consistently reported that the transmission lost power at inopportune times, leaving drivers unable to maneuver in traffic or startling other drivers, leading to crashes, near crashes.

107.     On September 20, 2011, Charles Baldree (a Ford sales manager for 30 years) contacted Mr. Lempke to share his own experiences in which a DPS6 transmission simply stopped working in third gear – a dangerous condition in certain driving scenarios:

> Just thought I would provide some feedback, and find out when the new TSB will be out. I am still having problems with my transmission (shuttering, hesitating, whining noise, etc) but this week a couple of new ones surfaced. I experienced it twice. Both time I think the car was probably in about third gear when the transmission seemed to go in "free fall.[sic] It simply stopped working. After a few seconds, the transmission kicked back in with a loud thump and shutter. The loss of power could have been serious in on-coming traffic. The original TSB helped with the shift points, but I am really hoping the second TSB will fix the remaining problems. I was looking at all the posts on Focus Fanatics and believe me there are many, many 2012 Focus owners who are up in arms over the Getrag transmission. I think if Ford doesn't do something quick there will be a revolt. Owners are so mad they are bad mouthing the product something furious. Also, some of them think there is a serious safety issue with the transmission and plan to contact the appropriate government authority to demand a recall. Other owners are asking for the Company to provide an extended warranty on the transmission.[8]

108.     Ford was well aware that it was likely that failures, complaints, crashes causing property damage and injuries were likely to continue.

---

[8] VGS20044739; Subject: 2012 Focus Transmission Issues; Charles Baldree; 2011.

109.     The DPS6 transmission suffers from multiple safety-related mechanical and electronic failures that emerged from the initial launch of the transmission in late 2010 (for the 2011 MY Fiesta) and continuing over a six-year period due to the Transmission Defects referenced *supra*. According to Ford's internal documentation, these Transmission Defects include:

> Because of a mismatched coefficient thermal expansion between the printed circuit board and the ATIC chips, over time, thermal cycling and mechanical strain will produce solder cracks on multiple ATIC91 ATC106 pins.[9] This leads to a loss of communication and an unintended neutral. Ford first learned of this issue in January 2010, when vibration and rapid change of temperature testing found pin failures and suspected solder failures: "Parts are being prepared for in depth solder joint investigation."[10]

> Software Calibration Issues. "Another issue that surfaced in 2016 was Ford's decision to release a software calibration that allowed power loads to the clutch that could result over time in the failure of either the friction plate or the pressure plates. Notably, software calibration issues have plagued the DPS6 Transmission since before its launch.

> Delayed Crank Failure. In 2016, Ford identified a delayed crank failure defect with the DPS6 that was due to the "clutch actuator lever component inside the transmission."[11]

110.     As a result of one or more of these defects, acting either individually or in combination, the transmissions in Ford DPS6-equipped vehicles consistently slip, buck, kick, jerk, harshly engage; and have premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration, create difficulties in stopping the vehicle, and, eventually, premature transmission failure.

111.     The Transmission Defects cause unsafe conditions, including, but not limited to suddenly lurching forward, delayed acceleration, and sudden loss of forward propulsion (*i.e.*, the

---

[9] VGS5-00365439; Re: Request for Confidential Treatment of Information Pertaining to a Recent WebEx Presentation, November 19, 2017.
[10] VGS7-0076353; GETRAG Summary for January 29,2010 Conti meeting: handout for today's 6DCT250 meeting; Ibrahim Kaddouh; Ford Motor Company; January 29, 2010.
[11] Ford DPS6-SAC 00045387; RE: QSF do Fiesta – info; Colin Menapace; Ford Motor Company; November 29, 2016.

"unintended neutral events" referenced above). These conditions present a safety hazard because they severely affect the driver's ability to control the vehicle's speed, acceleration, and deceleration. For example, these conditions make it difficult to safely merge into traffic. Even more troubling, the Transmission Defects can cause the vehicle to fail to downshift and decelerate, but instead continue to transfer power to the transmission and even surge the engine's RPMs, when the brakes are depressed. As a result, drivers of DPS6-equipped vehicles have reported their vehicles lurching forward into intersections at red lights due to the failure of their braking efforts to stop the vehicle.

112.     Plaintiff is informed and believes, and on that basis alleges, the Transmission Defects also cause premature wear to the PowerShift Transmission's clutch plates and other components, which results in premature transmission failure and requires expensive repairs, including premature transmission replacement.

113.     As early as 2010, Ford knew or should have known that the PowerShift Transmission was defective.

**DESPITE KNOWING THAT THE DPS6 POWERSHIFT TRANSMISSION HAD SAFETY DEFECTS, FORD FALSELY AND PUBLICLY REPRESENTED – TO PLAINTIFF, CONSUMERS, AND GOVERNMENT REGULATORS – THAT THE PROBLEMS WITH THE DPS6 TRANSMISSION WERE NOT SAFETY-RELATED**

114.     In its official communications with national agencies charged with consumer protection or safety, Ford characterized the DPS6's myriad defects as customer satisfaction or transmission quality issues and denied that they had caused any (or only a few) crashes.

115.     In a November 2014 presentation to the NHTSA, Ford purported to address the solder cracks on the ATIC chips in the MAM, transmission shift quality, rollback, the shudder problem and the leaking input shaft seals problems detailed above. But in this presentation, Ford did not mention any threats to safety, nor did Ford include information about crashes and injuries that were

alleged to have been caused by the loss of motive power and other transmission defects.[12]

116.    Ford acknowledged internally that as of May 31, 2015, it had received 33,408 warranty reports alleging "loss of motive power" & "no starts" on vehicles with DPS6 transmissions identified in warranty analysis in all regions based on the MAM communications concerns detailed above."[13]

117.    In March 2016, Ford (via its wholly owned subsidiary Ford of Australia) made a similar presentation to the Australian Competition and Consumer Commission (ACCC) about the complaints regarding the DPS6 by enumerating its actions to repair vehicles via a Technical Service Bulletin. A month earlier, the Australian Department of Infrastructure and Regional Development, which assists the ACCC on matters of vehicle safety, initiated an investigation based on "several complaints over the past four years relating to 2010- 2014 Ford Focus and Ford Fiesta transmissions. "The Department considers reports of safety issues of non-compliant standards, and where a potentially systemic issue is identified, the Department may investigate further." The DIRD sent seven complaints and asked Ford if it had received similar complaints and asked, "Is Ford aware of any reported safety incidents attributed to the dual clutch transmissions in Focus or Fiestas?"[14]

118.    In January 2017, Ford made yet another similar presentation to the Thailand Office of the Consumer Protection Board, detailing the wet and dry shudder issues. It did not mention the solder cracks in the MAM. Again, Ford asserted:

> The quality issues do not pose safety concerns • Wet and dry clutch shudder affects drive quality only. Ford's Automotive Safety Office (ASO) met with the US National Highway Traffic Safety Administration (NHTSA) to review the PowerShift quality issues and share field data. NHTSA reviewed the data, asked for additional data, and has not identified a safety defect. Ford Thailand has not received any reports of injuries relating to the PowerShift transmission quality

---

[12] VGS5-00365439; Re: Request for Confidential Treatment of Information Pertaining to a Recent WebEx Presentation, November 19, 2017.
[13] VGS7-0179114; Field Review Committee Fact Sheet Draft; undated.
[14] Ford-DPS6-SAC- 00021948; Ford Focus and Fiesta Transmission Complaints [SEC=UNCLASSIFIED]; Caitlin Arnold; Department of Infrastructure and Regional Development.

concerns. Ford ASO has continued to monitor field data and has not identified a safety issue.[15]

119. In press statements, Ford continued to assert that the DPS6's multiple defects did not threaten safety, nor did they cause crashes.

120. For example, in a statement intended for the European press about the leaking input shaft seals, Ford stated: "Is this a safety issue for customers? No. Our team has investigated every report. After an exhaustive engineering evaluation, we have identified the concern as a shift-quality issue, and not safety related."[16]

121. In a statement intended for the Chinese press Ford similarly stated: "Is his a safety issue? Have you received any reports of injuries or accidents related to this issue? [PD] No."[17]

122. Contrary to these definitive public statements, in private/internal corporate communications Ford officials described the MAM failures as longstanding safety hazards and acknowledged that the cracks in the solder joints, along with the dry shudder and leaking input shaft seals defects were linked to crashes, injuries and one death.

123. In May 2011, a 2011 Fiesta was brought into service for a condition in which the vehicle went forward while in reverse gear. An email exchange between Ford engineers David Lemke and Tom Hamm noted: "Tom…make the call down there ASAP.. find out more details.. Ford Safety Office wants to get involved."[18] And in another email related to this vehicle Hamm asks a colleague to prevent the dealer from swapping out the vehicle's transmission before they can take a closer look: "I wouldn't be asking if it wasn't a safety issue."[19]

124. In August 2012, Ford officials prepared a "white paper" to outline the problem: "Ford

---

[15] Ford-DPS6-SAC 0012328; Meeting with OPCB; Ford Motor Company; January 20, 2017.
[16] VGS5-00324037; DPS6 Quality Issue - European Perspective; Ford Motor Company.
[17] VGS7-0130891; Questions to be answered; Ford Motor Company.
[18] VGS20039682; FW: Report Summary for the CQIS Report#BEFAK003; David Lempke; May 9, 2011.
[19] VGS20039744; RE: Vehicle located at Hampstead, N.Y. Tom Hamm; May 10, 2011.

vehicles equipped with DPS6 transmission may experience a loss of motive power due to an issue with the DPS6 MAM. Approximately 2.1M global vehicles have been produced with potential for this concern. A Permanent Corrective Action (PCA) has been identified and will be in production by March 2015. Purchasing is working with the MAM supplier to increase production capacity for additional service parts supply."[20]

125.     In an August 13, 2012 internal email exchange regarding the DPS6 MAM among Ford transmission engineers, Jay Richardson of Ford's "6F15/DPS6/MPS6/FN Transmission Planning Powertrain Strategy & Business Office" noted: "This being said, Roger has passed on that this is a Safety issue. If that is true, then this is a must do regardless of business case. The paper needs to clearly point out this issue."[21]

126.     In 2013 (contrary to Mr. Kwasniewicz's later assertion), Ford and Getrag engineers were able to witness first-hand DPS6 safety concerns, such as the "slingshot" behavior:

> John and I were at a dealer last week and invited the Getrag team to come along- to get some real world feel of tech issues - unfortunately the guy didn't have bring equipment with him - we drove a vehicle that had a sling shot affect during slight power on down shifts what do you do for that one??? tell customer its normal and they wasted their time bringing it in, perform the IDS routines and adaptive drive and see if that helps or slap a TCM or a clutch into it - or both. These are the situations we need deeper diagnostics.[22]

127.     In January 2014, Ford issued a "White Alert," defined as a "report of possible safety or regulatory concern," for a customer concern described as "an engine stall while driving, hard to start."[23]

128.     In a March 26, 2014 internal email exchange that included Gunnar Hermann, Ford of

---

[20] VGS7-0059304 Overt Detection and Early Warning of DPS6 Mechatronic Actuation Module (MAM) Issue. Ford Motor Company; 2014.
[21] VGS20149430; DPS6 NG MAM Paper; Jay Richardson; Ford Motor Company; August 13, 2012.
[22] RE: AVL Data from Ford Fiesta/Focus; Jeremiah Cannon; Ford Motor Company; April 4, 2013.
[23] VGS20207472; RE: Israel White Alert for Stall; Mark Thompson; Ford Motor Company; January 22, 2014.

Europe's vice president for quality and Mr. Kwasniewicz, Ford employees admitted that the stalling reports were safety concerns: "Ted, Scott during my visit here in Israel, I was confronted with 4 cases, where stall conditions occurred while driving. This is clearly a safety related issue. Can you share your workplans please, need to understand how far we are away from a solution. I would appreciate your feedback."[24]

129.    In January 2015, an engineer discussing a Field Service Action related to the MAM defect noted that solder cracks on ACT 91 were a safety hazard: "Not sure 106 DTC's should be included as they don't have the safety issue the 91 does ... as they maintain ASM 3 speed.[25]

130.    Over a two-year period from September 2014 to August 2016, Ford engineers opened three 14D investigations – one into the MAM/ATIC chip failures, one into the leaking input shaft seal problem and one into the dry shudder problem. A 14D is often a precursor to a recall. According to Ford's FMEA Handbook:

> Before an automotive manufacturer engages in a campaign, there has been thorough investigation and analysis of the issue. Often this analysis begins with a Global 8D where the root cause which generated the in field defect to occur is determined. Additionally, the "escape" root cause is determined. In other words, how did the product testing miss this defect? Corrective actions are targeted at both items and implemented as part of the correction to the vehicles in question. When an issue is raised to a recall, the Global 8D will have additional information added, and it will become a 14D. Both of these investigations characterized the problems as design defects and noted crashes and injuries associated with these defects.[26]

131.    On or about September 2014, Ford engineers initiated a 14D to analyze the leaking input shaft seal problem and noted: "Ford Transmission Driveline Engineering (TDE) has sealing system design rules that apply to internal designs.

132.    As noted, *supra*, Ford did not share with various governmental agencies the extent of

---

[24] Subject: AW: Israel White Alert for Stall; Gunnar Hermann; Ford Motor Company; March 26, 2014.
[25] VSG7-0163883 RE FSA; Jerimiah Cannon; Ford Motor Company; January 14, 2015.
[26] FMEA Handbook; Version 4.2; Pg Glossary-2; Ford Motor Company 2011.

its knowledge of the various defects, nor of the crashes and injuries associated with them. Indeed, the NHTSA review into the DPS6 transmission defects never led to an actual defect investigation because Ford never disclosed the full details about the safety issues.

133.     As a result, Ford was successful in avoiding both a rapid decline in sales and safety recalls by hiding the DPS6 safety defects from consumers and regulators.

134.     Rather than issue safety recalls for a problem Ford could not "fix," Ford instead launched four different "Special Customer Service Campaigns" from 2011 to 2016, which merely extended the warranty duration for Focus and Fiesta vehicles plagued by leaking input shaft seals and the MAM solder cracks.[27] In addition, Ford issued no fewer than 17 Technical Service Bulletins (TSBs) from 2010 to 2016 outlining Ford-recommended repair procedures for a litany of DPS6 Transmission problems.

135.     In July 2017, the Australian Competition and Consumer Commission initiated proceedings against Ford, "alleging that it engaged in unconscionable and misleading or deceptive conduct, and made false or misleading representations in its response to customer complaints." Specifically, the ACCC alleged that Ford consistently "lied to its customers about the nature of the defect – blaming it on their driving styles, rather than the transmission. About 35,000 vehicles sold in Australia had at least one repair relating to the DPS6 transmission, yet Ford refused to provide a refund or replacement vehicle to consumers, even after multiple repairs did not fix the issues. In most cases, Ford only provided replacement vehicles in accordance with its "PowerShift Ownership Loyalty Program," which required consumers to make a significant payment [$7,000] towards a replacement

---

[27] Customer Satisfaction Program 11B31, Ford Motor Company, January 13 2012; Customer Satisfaction Program 14M01; Ford Motor Company; July 21, 2014; Customer Satisfaction Program 14M02; Ford Motor Company; February 20, 2015; Customer Satisfaction Program 15B22; Ford Motor Company; August 4, 2015.

vehicle."[28]

136.     In April 2018, Australia's Federal Court ordered Ford to pay a (AUS $10 million fine for "unconscionable conduct." In addition, Ford had to establish a program to review customer requests for refunds or replacement vehicles made between May 1, 2015 and November 1, 2016, and to provide customers with access to more information about their cars, including the history of manufacturing defect repairs performed on their vehicles.[29]

137.     In 2018, Ford was forced in a civil trial in Thailand to compensate 291 Focus and Fiesta owners for selling substandard vehicles. In the country's first verdict in a class-action ruling, the South Bangkok Civil Court ordered Ford Sales & Service to pay between 20,000 and 200,000 baht each, plus a 7.5% interest rate a year, for repair costs and lost time. "The award was for the production of unsafe, substandard and defective vehicles which put drivers at risk."[30]

## FORD FAILED TO COMPLY WITH ITS REGULATORY OBLIGATIONS AND REPORTING RESPONSIBILITIES

138.     As a global automaker, Ford is aware of its safety recall obligations under controlling U.S. law; and has issued safety recalls for vehicles with defects that cause unintended stalls.

139.     This controlling U.S. law includes, but is not limited to, Title 49, section 573 of the Code of Federal Regulations, entitled, "Defect and Noncompliance Responsibility and Reports," sets forth the obligations and responsibilities of motor vehicle manufacturers such as Ford under 49 U.S.C. §§ 30116-30121 (a portion of the National Traffic and Motor Vehicle Safety Act) regarding safety-related defects and noncompliance with Federal Motor Vehicle Safety Standards (FMVSS).[31] Among

---

[28] ACCC takes action against Ford; press release; Australian Competition & Consumer Commission; July 27, 2017.
[29] Court orders Ford to pay $10 million penalty for unconscionable conduct; press release; Australian Competition & Consumer Commission; April 26, 2018.
[30] Ford Thailand Ordered to Compensate Focus and Fiesta Owners for Selling Substandard Vehicles; Chiang Raj Times; September 22, 2018.
[31] 49 CFR § 573.

those obligations are reporting requirements to the National Highway Traffic Safety Administration ("NHTSA") to inform the agency of defective and noncomplying vehicles and equipment, and to allow NHTSA to assess the adequacy of manufacturers' defect and noncompliance notification campaigns, of the corrective action, the owner response, and to compare the defect incidence rate among different groups of vehicles.[32] Manufacturers are required to furnish a report to NHTSA "for each defect in his vehicles or items of original or replacement equipment that be or the Administrator determines to be related to motor vehicle safety, and for each noncompliance with a motor vehicle safety standard in such vehicles or items of equipment which either be or the Administrator determines to exist."[33]

140.    Further, under the Motor Vehicle Safety Act, 49 U.S.C. 30101, "motor vehicle safety" is defined in relation to NHTSA's enforcement and regulatory authority as the "the performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident, and includes nonoperational safety of a motor vehicle."[34] This regulation sets a "5 working day" deadline for a manufacturer to make such notification:

> Each report shall be submitted not more than 5 working days after a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist.[35]

141.    Ford violated this reporting requirement by failing to report the safety-related defects, accidents, incidents and other matters alleged above to NHTSA within the mandatory five working day period.

---

[32] 49 CFR § 573.2.
[33] 49 CFR § 573.6.
[34] 49 USC § 30102(a)(9).
[35] 49 CFR § 573.6.

142. Moreover, Ford consciously avoided a recall of the DPS6 transmission by claiming to several governmental authorities around the globe, including NHTSA, that the DPS6 transmission's multiple malfunctions only amounted to "customer satisfaction issues" and had not been linked to crashes, injuries and fatalities.

143. Ford understood its obligations under federal regulations to report these safety defects to the NHTSA, but rather than comply with federal law, Ford instead created a false narrative to NHTSA to forego a safety recall by focusing on improving the warning to customers before an impending transmission failure.

144. Ford has two divisions devoted to ensuring that its products meet all Federal Motor Vehicle Safety Standards and regulatory responsibilities – the Automotive Safety Office (ASO) and the Office of the General Counsel (OGC). According to Ford: "The Automotive Safety Office Serves as primary interface with organizations that deal with vehicle safety and defect/compliance matters and contributes technical advice to government agencies regarding safety rulemaking. We also provide technical analysis related to field performance of Ford vehicles."[36] In addition, Ford's Office of General Counsel "interfaces with regulatory agencies, including EPA, NHTSA, EEOC and state attorneys general."[37] Further, in Ford's 2014 Corporate Sustainability Report, Ford demonstrates its knowledge of its obligations under the Safety Act:

> In the U.S., the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act") regulates vehicles and vehicle equipment in two primary ways. First, the Safety Act prohibits the sale in the United States of any new vehicle or equipment that does not conform to applicable vehicle safety standards established by the National Highway Traffic Safety Administration (NHTSA). Second, the Safety Act requires that defects related to motor vehicle safety be remedied through safety recall campaigns.

---

[36] Ford Automotive Safety Office;
https://corporate.ford.com/careers/departments/sustainability-environment-and- safety-engineering.html.
[37] Ford Office of the General Counsel;
https://corporate.ford.com/careers/departments/office-of-the-general- counsel.html.

Manufacturers are obligated to recall vehicles if they determine the vehicles do not comply with a safety standard or contain a defect affecting safety.[38]

145.    Further, Ford's internal process documents remind employees of these obligations. For example, in July 2013, Ford employees Joseph Borneo and Robin Buseck requested that Ford's 6-Sigma Center initiate a "Things Gone Wrong" ("TGW") Task Force to conduct a consumer survey on the problems with the Focus and Fiesta DPS6 to determine how drivers experienced the transmission defect.[39] As part of this process, the form used to make the request emphasized that the Ford Automotive Safety Office or the Office of General Counsel may ask for the results to satisfy a NHTSA inquiry. It also noted that any Transportation Recall Enhancement, Accountability and Documentation (TREAD) Act-reportable information obtained by the survey must be included in Ford's quarterly TREAD submission.

146.    This knowledge is evident in Ford's internal communications regarding the defects in the DPS6 transmission, in which Ford employees discuss scenarios that could prompt a recall, and ways to avoid triggering a TREAD reportable incident or the attention of the regulators.

147.    For example, in January 2009, Ford engineers exchanged information indicating that Ford was aware that other manufacturers had launched recalls for defects like those that could affect the DPS6 transmission. In a January 21, 2009 email, Mr. Kirchhoffer shared a Daimler Trucks recall of 2,426 Thomas Built Buses, in which the automatic transmission control module could become corroded due to water and road spray intrusion, causing the starter motor to engage unexpectedly or the backup lights to operate intermittently.[40]

148.    Mr. Kirchhoffer reminded his colleagues how severity levels assigned on the FMEA

---

[38] 2014-15 Ford Sustainability Report.
[39] VGS20130916; 6-Sigma Center Survey Request Form; Ford Motor Company; July 18, 2013.
[40] VGS5-00021665; RE: MAM - Interface FMEA Summary+ SEV Reduction Process (YC Reduction Process) - Reclassified for 'Loss of Drive'; Johann Kirchhoffer; Ford Motor Company; January 21, 2009.

related to field actions later:

> From the Campaign Prevention team and connecting to the CP DD2 I would like to share with you the attached information about a campaign/field service Action, concerning a TCU exposed to splash water and corrosion similar to the MAM on the DPS6. The Failure Modes affecting the Back Up Light and Cranking leading to 'Unexpected Vehicle Movement' or Traffic Irritation are affected. This is effecting item 2.1.2) - Back Up Light Function - from the Electrical FMEA and item 2.4) concerning the Mechanical FMEA, failure modes leading to the back up light electrical malfunction. This an additional awareness item with respect to the YC classifications isolated under items 2.1.2 and 2.4![41]

149.    Ford employees also discussed how to go about repairing vehicles with DPS6 Transmission Defects using protocols that would not violate the TREAD Act. Thus, Ford demonstrated its knowledge that customer complaints and warranty claims are reportable events.

150.    In an internal September 6, 2016 email string, Craig Renneker, the Ford Chief Engineer for Front-wheel-drive A/T & D/l Systems Transmission & Driveline Engineering, discussed fixing the clutch in a DPS6 transmission of a Detroit school teacher who had complained about the problems with his new Focus to a former Ford employee, now a reporter with Crain Communications. Renneker warned that the company protocol must be followed to avoid a TREAD Act violation: "Yes - this is a concern (TREAD Act), which is why we need to follow the FCSD "VIP Ticket" process. Please call Paul S. directly to coordinate.[42]

151.    In another Ford internal email string dated May 24, 2017, Mr. Renneker discussed fixing a DPS6 clutch for a customer out of warranty:[43]

> Mike;
>
> She has an 8080 clutch installed at 80k miles. Replacing hers with an 8040 will give us a "picky customer" data point to check the efficacy of the new material. Are you

---

[41] VGS5-00021665; RE: MAM - Interface FMEA Summary+ SEV Reduction Process (YC Reduction Process) - Reclassified for 'Loss of Drive'; Johann Kirchhoffer; Ford Motor Company; January 21, 2009.
[42] Ford DPS6-SAC 00038320; RE: Hey, Bob ... (Rich Truett email on 2015 DPS6 Focus); Craig Renneker; Ford Motor Company; September 6, 2016.
[43] Ford-DPS6-SAC 00054061; Subject: RE: Replacing transmission on out-of-warranty vehicle for engineering feedback; Craig Renneker; Ford Motor Company; May 24, 2017.

saying that the 8080 clutch replaced under the FSA itself has a 2 year/24 month warranty that would cover the full cost (parts and labor) to give her a new 8040? She is specifically complaining about the judder, but believes that there is nothing else the dealer can do. If the warranty does NOT cover her, do we have an approved procedure for an engineering investigation to replace her clutch/trans with engineering$? I'm mindful of TREAD act.

Guys;

Thanks. Please don't pull the trigger on this yet. I've had 5 notes back/forth between me and the FCSD Director. I want to take care of this, but need to do it EXACTLY the right way. I hope to be able to give clear direction yet today. They have another funding mechanism that may be a better path as this has senior executive attention.

152.    In at least one instance, Ford engineers actively discussed how to avoid triggering government attention that might lead to a recall. In a Ford internal email string dated March 4, 2013, Ford engineers discussed yet another emerging defect issue involving the DPS6's transmission in which the shift drums failed to achieve proper referencing:

On every start-up the shift drums will move to the end stop and confirm position. This is done for safety reasons as the control system needs to know the exact position of the synchros to prevent an unintended movement. The failure to achieve proper reference is usually caused by low system voltage during crank (low voltage can either inhibit the driving force of the shift drum), it could also indicate a motor problem or a mechanical blockage…As a result of the continuous learnings, there have been multiple changes to fine tune the referencing sequence to stagger the shift drum movement so that the system voltage has recovered from the engine start. Whenever the transmission fails to achieve the reference position it sets an internal code (P2832 or P2837) and temporarily disables the gears which did not reference correctly.[44]

153.    In response, Ford DPS6 Transmission Manager, Christopher Kwasniewicz, noted that Ford was about to release a TSB for transmission shudder, which would require a software re-flash the calibration, even though it might set error codes that would send the customer back to the dealer. This situation was preferable to dealership techs replacing clutches, which was costing Ford $3

---

[44] VGS20020225; RE: P2832 & P2837 Back Ground Info On Shift Drum Reference; Piero Aversa; Ford Motor Company; March 2, 2013.

million a month in warranty costs.[45]

154.     Indeed, Ford had cast the DPS6 transmission's myriad of failures as a design problem, owned by Getrag.[46] And trying to fix the problems had been enormously expensive for Ford.

155.     In a March 10, 2014 letter to Getrag, Ford's Global Director, Powertrain Installation Purchasing, Alan Draper, noted that fixing the leaking input shaft seals alone would cost Ford hundreds of millions of dollars:

> After considerable technical analysis into the DPS6 seal leak concerns, Ford has determined that the appropriate remedy for affected vehicles is to initiate two separate customer satisfaction actions aimed at maintaining confidence in vehicles equipped with DPS6 transmissions built prior to the incorporation of the shaft seal material change in 2013.
>
> 1.     Proactive seal repair of 856K DPS6 equipped vehicles
>
> 2.     Extended warranty for 1.4M DPS6 equipped vehicles (including vehicles campaigned for the proactive seal repair)
>
> The initiation of these actions along with the corresponding customer notification is pending completion of a robust service part supply plan. Getrag's support of this plan is recognized, and I ask for your team's continued help as we work to finalize the details. At this time, we are forecasting that these actions alone will cost us over $650M through the 2019 calendar year in addition to our normal warranty coverage.[47]

156.     Ford knew from years of experience of working with the NHTSA that the agency tended to evaluate the recall potential for a defect that caused an engine stall or a loss of motive power, based on whether the particular condition gave the driver any warning of the impending stall and whether the driver could quickly recover motive power.

157.     The NHTSA's position has its roots in a 1986 study commissioned by the U.S. Department of Transportation Research and Special Programs Administration. The Transportation

---

[45] VGS20020225; RE: P2832 & P2837 Back Ground Info On Shift Drum Reference; Chris Kwasniewicz; Ford Motor Company; March 2, 2013.
[46] VGS21355122; FW: DPS6 Getrag Status Update; Allyson Waldman; Ford Motor Company; March 24, 2014.
[47] VGS20415045; Alan Draper Letter; Ford Motor Company; March 10, 2014.

Systems Center issued a report which attempted to identify "patterns which could yield insight concerning the safety implications of stalling," "high-risk stalling situations;" and "high-risk vehicles/components."[48] The researchers looked at complaints, calculated crash rates and compared these data to a sample of investigations which resulted in recalls or were closed with no findings. The researchers also analyzed a sample of the crash reports "to determine which vehicle characteristics and stalling circumstances were related to serious safety problems."[49]

158.    The researchers concluded that stalling incidents that occur without warning, at high speeds, or upon acceleration are associated with stalling-related accidents more frequently than other types of stalling problems. For example, loss of power steering or brakes due to stalling is cited as a common accident cause.[50] In cases of a total loss of control, nearly half were involved in accidents. In addition, the 4.8 percent of drivers who had no warning of the stalling incident before it occurred were involved in accidents approximately 13 times more other than those who had some warning prior to their stalling incident.[51]

159.    With that in mind, Ford worked assiduously to avoid fulfilling its recall responsibilities, by persuading NHTSA that drivers who experienced a loss of motive power due to the solder crack issue in the MAM could quickly recover.[52] And, rather than recall and replace the defective clutches, or buy back the vehicles, Ford engineers proposed a $1.5 million project to "develop and test a software strategy that provides early warning to the customer (Overt Detection) prior to a MAM

---

[48] Analysis of Stalling Problems; Simon Prensky; Pg. ii; U.S. Department of Transportation Research and Special Programs Administration Transportation Systems Center; November 1986.
[49] Analysis of Stalling Problems; Simon Prensky; Pg. ii; U.S. Department of Transportation Research and Special Programs Administration Transportation Systems Center; November 1986.
[50] Analysis of Stalling Problems; Simon Prensky; Pg. ii; U.S. Department of Transportation Research and Special Programs Administration Transportation Systems Center; November 1986.
[51] Analysis of Stalling Problems; Simon Prensky; Pg. ii; U.S. Department of Transportation Research and Special Programs Administration Transportation Systems Center; November 1986.
[52] VGS5-00365439; Re: Request for Confidential Treatment of Information Pertaining to a Recent WebEx Presentation, November 19, 2017.

concern that may result in the loss of motive power."[53]

160.     Among the benefits outlined were a faster implementation of a software reflash of the MAM, avoiding customer dissatisfaction because drivers would have time to "schedule MAM replacement at the dealer, prior to MAM concern that has the potential to leave them stranded," and reduce costs by spreading the demand for MAM replacements over time.[54] Finally, the proposal noted that an overt detection strategy would "satisfy NHTSA - Overt Detection is a pro-active action to protect our customers, which will more easily satisfy NHTSA's requirements."[55]

161.     This latter idea was also expressed in Ford communications regarding its presentation to the Australian government probing the failures of the DPS6. On March 8, 2017, Mariusz Czubek, a specialist with the Ford AP Warranty Spend Reduction Group, contacted Ford Engineer Jonathan Graves of the DPS6 Transmission group for information to aid his analysis on the effectiveness of the new software re-flash under Customer Satisfaction Campaign 15B221 which caused a warning light "to come up and hopefully prevent them 'getting stuck.'"[56] In reply, Mr. Graves noted: "15B22 was released to satisfy NHTSA recall requirements and updates each vehicle to Overt Software for early detection of solder cracks."[57]

162.     In its reply to the NHTSA's information request, Ford was prepared to stake its position against a recall on the argument that other systems, such as noting that the brakes and airbags and steering still worked, that there was a warning to the driver, and that new software would make

---

[53] VGS7-0059304 Overt Detection and Early Warning of DPS6 Mechatronic Actuation Module (MAM) Issue. Ford Motor Company; 2014.
[54] VGS7-0059304 Overt Detection and Early Warning of DPS6 Mechatronic Actuation Module (MAM) Issue. Ford Motor Company; 2014.
[55] VGS7-0059304 Overt Detection and Early Warning of DPS6 Mechatronic Actuation Module (MAM) Issue. Ford Motor Company; 2014.
[56] DSP6-SAC 00050546; Subject: RE: MAM DTC fault code effect on customer; Mariusz Czubek March 10, 2017.
[57] DSP6-SAC 00050546; Subject: RE: MAM DTC fault code effect on customer; Jonathan Graves; March 10, 2017.

the driver aware of the need for service before the cracks grew large enough to cause serious problems. According to a draft response, Ford officials noted:

> Closing rationale -This should include:
>
> • Because solder fatigue crack propagation is progressive in nature, associated warnings and drivability symptoms are progressive in nature, as well. Of customers that allege to have eventually lost mobility, the majority said they were able to regain mobility either immediately or within minutes by moving the shift lever or cycling the key.
> • Other vehicle systems such as power steering, power brakes, restraint systems, electrical functions, etc. are unaffected
> • Ford's extended warranty letter to customers highlights the vehicle symptoms associated with this condition, and provides financial coverage in order to encourage vehicle repair before the symptoms progress in nature.

## FORD HAS CONDUCTED SAFETY RECALLS AS TO DEFECTS THAT CAUSED STALLS VIRTUALLY IDENTICAL TO THE UNINTENDED NEUTRAL EVENTS THAT MAKE THE DPS6-EQUIPPED VEHICLES UNSAFE

163. Ford is "on notice," due to its history of selling defective vehicles and regulatory enforcement actions and court proceedings, that it is legally required to recall vehicles that suffer from unintended neutral/loss of motive power/stall condition events.

164. In the last 15 years, Ford has launched seven (7) such recalls – including four between 2012 and 2016, the same period in which Ford avoided recalls for unintended neutral/loss of motive power conditions caused by the DPS6 transmission.

165. In 2003, Ford became the only automaker to issue a judicially ordered recall for a stalling condition, after two decades of failed NHTSA investigations. From 1982 to 1997, the NHTSA investigated ignition module failures, but Ford misled the agency for years about the causes of stalling (affecting multiple models and model years) with no consequences to the company. In the absence of accurate information from Ford, NHTSA's Office of Defect Investigations ("ODI") was unable to identify the failure. Thus, the ignition defect bears the distinction of being the first court-ordered recall

outside of the NHTSA.

166.     The ignition module defect caused loss of power like that affecting the DPS6 equipped vehicles. Ford's ignition system[58] was heat- sensitive, yet Ford placed it in the hottest location under the hood; at certain temperatures, the module would cut out, causing the vehicle to stall at highway speeds.[59] After four years Ford's warranty data showed that the return rate far exceeded projections, but many of the returned parts did not exhibit the failure mechanism because, once cooled down, the component would resume working. Ford eventually identified the problem but failed to act on its knowledge.[60]

167.     The NHTSA launched five investigations but could not definitively isolate a root cause of the stalling, in part because Ford withheld documents that would have shown the effect of thermal stress on the ignition modules resulted in stalling, instead of a range of drivability issues.

168.     In 1987, the NHTSA examined the stalling issue in 2.6 million 1983 through 1986 Escort, Tempo, Mustang, LTD, Thunderbird, EXP, Cougar, Topaz, Capri, Merkur, Lynx and Marquis vehicles equipped with 1.6 liter or 2.3-liter engines. The NHTSA's Office of Defects Investigation investigated based on 33 stalling complaints; Ford located another 1,819 field reports and 649 complaints, but it combined different complaints into one pool of "failure to start the engine, poor engine performance and engine stalling."[61]

169.     Ford cast the DPS6 defect as a drivability issue: "As we have stated to the agency in the past, today's engine and emission system controls have become very intricate and the diagnoses

---

[58] The "trouble not identified" phenomenon in automotive electronics; Dawn Thomas, et al; Microelectronics Reliability; January 23, 2002.
[59] The "trouble not identified" phenomenon in automotive electronics; Dawn Thomas, et al; Microelectronics Reliability; January 23, 2002.
[60] The "trouble not identified" phenomenon in automotive electronics; Dawn Thomas, et al; Microelectronics Reliability; January 23, 2002.
[61] PE87-028; Opening Letter; National Highway Traffic Safety Administration; May 12, 1987.

of drivability and/or stalling conditions have likewise become very difficult."[62]

170.     Both Ford and NHTSA conceded that the ignition module was to blame:

> Clearly evident is the fact that Ford experienced a massive engine controllability
> problem with the introduction of a new thick film ignition module (TFI) in the
> 1.6 and 2.3 liter engines…Ultimately, Ford engineers identified the root cause of
> the problem to be thermal fatigue of the TFI ~ transistor assembly and integrated
> circuit failures which were aggravated by elevated engine compartment
> temperatures and by thermal cycling.[63]

171.     But Ford misled the NHTSA about the scope of the problem and oversold its ability to resolve the issue.[64]

172.     A class action lawsuit on behalf of Ford owners prompted the NHTSA to open a sixth investigation in 1997, which revealed that Ford had failed to produce documents to the agency. By then, the eight-year statute of limitations on recalls had passed, and the civil penalties the agency could have imposed were low.[65] In 1999, the lawsuit ended in a hung jury, but resulted in a judicially ordered recall. Ford eventually settled the litigation in 2003 by doubling the component's warranty.

173.     Another recall also illustrates Ford's refusals to accept responsibility for loss of power problems. In April 2004, a NHTSA probe forced Ford to recall 321,903 2001-2003 Escape vehicles for a condition in which a fuel-rich mixture could cause the vehicles to stall during decelerations at speeds below 40 mph.[66] In its Part 573 Notice of Defect and Noncompliance, Ford argued that the vehicles were still controllable and re-started immediately:

> Ford's investigation found that the vehicles remained controllable after such engine
> stalls and can readily be maneuvered off the roadway. Further, the vehicles typically
> restart immediately, and some owners reported starting their vehicle without
> coming to a stop coming to a stop. While it may be argued that stalling under certain

---

[62] PE87-028; Closing Resume; National Highway Traffic Safety Administration; May 1, 1987; PDF pg. 11.
[63] PE87-028; Closing Resume; National Highway Traffic Safety Administration; May 1, 1987; PDF pg. 11.
[64] Howard v. Ford' Plaintiff's Opening Trial Brief; Phase Two; June 12, 2000.
[65] Lawsuit Asserts Ford Knowingly Installed Defective Mechanism in Millions of Vehicles; Tim Golden; The New York Times; September 6, 1997.
[66] Recall 04V165; Notice of Defect and Noncompliance; Ford Motor Company; April 5, 2004.

conditions may increase the risk to safely, the stalling characteristics in this population of vehicles do not pose an unreasonable risk of accident or injury. The reports in this investigation clearly bear this out. Ford does not by taking this action, admit that a safety defect exists in these vehicles nor does Ford believe that engine stalling presents an unreasonable risk to motor vehicle safety. Ford Believes that the agency should update its earlier study of engine stalling as a sequel to the earlier "Analysis of Stalling Problems," sponsored by The Transportation System Center.[67]

174.     In June 2005, Ford recalled 180,104 Ford F-SuperDuty, Excursion, and E-Series vehicles from the 2004-2005 model years, equipped with 6.0l diesel engines, for reported engine stalling to address two wiring related conditions, specifically that the FICM wire harness chafing or improper ICP sensor connector crimps could cause the vehicle to stall without warning, with no re-start.[68] Ford argued that the stalling hadn't caused any injuries or crashes:

Ford's investigation has demonstrated that the reported stalling incidents in the affected vehicles do not present an unreasonable risk to safety. The vehicles remain controllable in the event of stalling. Real world performance, with virtually no accidents or injuries, supports our analysis. Nonetheless, to address customer satisfaction concerns and to avoid prolonged discussions with the agency, we are conducting this recall.[69]

175.     In January 2012, the NHTSA compelled Ford to recall 205,896 2004 and 2005 model year Ford Freestar and Mercury Monterey vehicles for problems that cause torque converter malfunctions and engine stalls. In its responses to an agency investigation, Ford laid out all of the same "controllability" arguments against a finding of a safety defect: According to Ford, the vehicle "remains readily controllable; the vehicle will coast during which it can be safely maneuvered and stopped because the engine continues to run. Because the engine continues to run, steering and braking are unaffected, and the vehicle's electrical system and directional signals remain functional. Further, the transmission park system remains fully functional. At that time only one ambiguous,

---

[67] Recall 04V165; Notice of Defect and Noncompliance; Ford Motor Company; April 5, 2004.
[68] Recall 05V270; Notice of Defect and Noncompliance; Ford Motor Company; June 7, 2005.
[69] Recall 05V270; Notice of Defect and Noncompliance; Ford Motor Company; June 7, 2005.

alleged minor accident involving a vehicle trailing behind the Freestar was identified with no alleged injuries."[70] Ford eventually launched a recall to "avoid a protracted dispute with the agency."[71]

176.     In October 2013, Ford recalled 2,456 Focus Electric vehicles (model years 2012-2014) for a failure of the Power Control Module. The defect caused "a sudden loss of motive power while driving, increasing the risk of a crash."[72] Drivers received warning in the form of "a red triangle indicator and the message 'Stop Safely Now' in the instrument cluster." Ford's Part 573 Recall Notice further stated that other safety-critical functions – "vehicle brake and steering systems will continue to operate normally and vehicle can often be restarted after going through a shutdown process."[73] According to the chronology Ford filed with its Part 573, Ford's Critical Concern Review Group initially wanted to pass off the issue as a customer satisfaction matter – despite 16 reports of "Focus Electric vehicles experiencing loss of mobility accompanied by a "Stop Safely Now" message in the instrument cluster." However, after the NHTSA opened a preliminary evaluation (PE13-031) into the issue as it affected 2012-2013 Focus Electric vehicles, the CCRG found additional reports and recommended a recall in October 2013.[74]

177.     In 2016, Ford recalled 865 Focus Electric vehicles (2015-2016 model years) because increased friction and excessive wear of a certain gear shaft could result in overheating and eventual fracture of the shaft or pinion gears. This could lead to loss of motive power while driving and loss of the transmission park function without warning, increasing the risk of a crash." Ford claimed it was not aware of any warranty reports, accidents or injuries related to the defect.[75]

178.     In August 2016, Ford recalled 77,502 2013-2015 Ford Taurus and 2013-2015 Ford

---

[70] Recall 12V006; Defect and Noncompliance Notice; January 9, 2012.
[71] Recall 12V006; Defect and Noncompliance Notice; January 9, 2012.
[72] Recall 13V523; Defect and Noncompliance Notice; October 21, 2013.
[73] Recall 13V523; Defect and Noncompliance Notice; October 21, 2013.
[74] Recall 13V523; Defect and Noncompliance Notice; October 21, 2013.
[75] Recall 16V479; Defect and Noncompliance Notice; June 27, 2016.

Taurus Police Interceptor, Lincoln MKS and MKT vehicles, due to the malfunction of a component within the fuel Pump Electric Module (PEM) caused by elevated temperatures within the module. "Malfunction of the fuel PEM may result in an open circuit causing a loss of electrical power to the fuel pump. If this occurs, the customer may experience an engine no start or an engine stall. In some cases, the engine may stall without warning or the ability to restart."[76]

179.     In October 2018, Ford recalled more than 1.2 million 2012-2018 Ford Focus vehicles due to a malfunctioning Canister Purge Valve (CPV) that can stick open and a Powertrain Control Module (PCM) software that does not adequately detect a stuck-open CPV.[77] In its Defect and Noncompliance notice, Ford noted that a stuck CPV "can cause excessive vacuum in the fuel vapor management system, potentially deforming the fuel tank. If this occurs, the customer may observe a Malfunction Indicator Light (MIL), inaccurate or erratic fuel gauge indication, drivability concerns or loss of motive power."

180.     In the case of the DPS6 Transmission, as in those prior cases, Ford actively concealed from the NHTSA its knowledge about the extent of the safety-related problems, and about the total number of crashes and injuries associated with the multiple DPS6 Transmission Defects. Ford took this course – not guided by engineering safety concerns – but out of political expediency with its supplier Getrag, and concerns about the enormous costs in delivering an effective repair or initiating a buyback program.

## FORD HAD EXCLUSIVE KNOWLEDGE OF THE TRANSMISSION DEFECTS AND FRAUDULENTLY CONCEALED THIS INFORMATION

181.     Ford had superior and exclusive knowledge of the Transmission Defects, and Ford knew or should have known that the Transmission Defects was not known or reasonably discoverable

---

[76] Recall 16V621; Defect and Noncompliance Notice; August 22, 2016.
[77] Recall 18V735; Defect and Noncompliance Notice; October 22, 2018.

to Plaintiff before purchasing the Vehicle.

182.     Since at least 2010, Ford has known about the Transmission Defects through sources not available to consumers such as Plaintiff, including through Ford's pre-release testing data, early consumer complaints to Ford and its dealers about the Transmission Defects, testing conducted by Ford in response to those complaints, Ford's internal data showing high failure rates and replacement part sales, aggregate data from Ford dealers, and other Ford-proprietary sources of aggregate information about the problem including, but not limited to, similar defects in the substantially identical models sold overseas.

183.     Ford knew about, and as a matter of business practice, failed to disclose and concealed, the Transmission Defects present in the DPS6-equipped vehicles, along with the Transmission Defects' dangerous safety and drivability problems, from consumers, including Plaintiff, when it sold the car, repaired the car, and thereafter. In fact, instead of repairing defects in the DPS6, Ford frequently either refused to acknowledge the defects' existence or performed superficial and ineffectual software upgrades that simply masked the symptoms of the Transmission Defects.

184.     The existence of the Transmission Defects is a material fact that a reasonable consumer would consider when deciding whether to purchase a vehicle equipped with a PowerShift Transmission.

185.     Consumers reasonably expect that a vehicle's transmission is safe, will function in a manner that will not pose a safety hazard, and is free from manufacturing defects. Ordinary consumers further reasonably expect that a car manufacturer such as Ford will not sell or lease vehicles with known safety defects, such as the Transmission Defects, and will disclose any such defects to consumers upon their discovery. Reasonable consumers, including Plaintiff, would not expect Ford to fail to disclose the Transmission Defects to them and to continually deny the defect.

**FORD'S FAILURE TO DISCLOSE THE DPS6 DEFECTS**

186.     Ford has never disclosed the PowerShift Transmission Defects to consumers prior to their purchases or leases of affected vehicles, nor at any point during their ownership of such vehicles. Similarly, Ford never instructed its dealerships to disclose the PowerShift Transmission Defects to potential purchasers or lessees of vehicles equipped with the DPS6.

187.     The PowerShift Transmission Defects were not known or reasonably discoverable by ordinary consumers before purchase or lease, or without experiencing the defect firsthand and exposing themselves to an unreasonable safety risk.

188.     Ford has remained silent publicly even as it issued service bulletins, conducted internal investigations, and witnessed the increasing failures of the DPS6 Transmission in its vehicles domestically and abroad.

189.     Ford's refusal to publicly acknowledge the defect has created widespread confusion. Ford's failure to notify consumers, dealerships, or auto-technicians prevents PowerShift Transmission problems from being efficiently diagnosed. Drivers are led to believe that the problems they are experiencing are actually "normal characteristics" of the PowerShift Transmission. Likewise, the lack of information makes it less likely that dealerships and auto-technicians will be able to diagnose and fix the PowerShift Transmission Defects or advise a consumer about the dangers of driving the affected vehicle.

190.     As a result of Ford's inaction and silence, consumers were entirely unaware that they had purchased, and were continuing to drive, an unsafe and unreliable vehicle. As Ford knows, a reasonable person would consider the PowerShift Transmission Defects important and would not purchase or lease a vehicle equipped with the PowerShift Transmission were its defects disclosed in advance or would pay substantially less for the vehicle.

**FORD ACTIVELY CONCEALED THE TRANSMISSION DEFECTS**

191.     As a result of the Transmission Defects, Ford was inundated with complaints

regarding the PowerShift Transmission. In July 2011, Ford implemented a communications strategy intended to minimize certain behavior of the PowerShift Transmission in order to "improve customer expectations." In a memo with instructions sent to Ford dealers and service personnel, which Ford intended its dealers and service personnel to rely on in their communications to consumers, Ford noted that "PowerShift optimizes fuel efficiency with up to 40MPG and driving dynamic 'Fun to Drive' performance." It further noted, "The PowerShift is really like two 3-speed manual transmissions put together, with the freedom of operating a clutch as the components are controlled electronically. Since most of the components are derived from a manual transmission, the PowerShift transmission will drive, sound, or feel like a manual transmission only the driver does not have to shift gears."

192.     Some of the common and "normal characteristics" of the PowerShift Transmission were listed as "double clicking metal sounds … of gears shifting and synchronizers (similar to a manual transmission);" a "slight gear whine while slowing or coasting," and "a reverse trailer hitching feel (or a slight bumping feel) … at about 2MPH." Ford also advised its dealers about low speed grinding, reverse gear whine, and "Green Clutches" which can "lead to a rattle noise" and "a take-off shudder /launch judder (shaky vs. smooth)." According to Ford, the shudder would become "progressively better … as the clutch breaks-in."[78]

193.     However, despite Ford's public insistence that these performance problems with the PowerShift Transmission were normal, in 2010 and 2011, Ford issued several TSBs to its dealers in the United States acknowledging defects in the PowerShift Transmission. Ford's TSB from September 2010, covering the DPS6-equipped 2011 Ford Fiesta, informs dealers how to address and attempt to repair the PowerShift Transmission in response to "concerns such as no engagement or intermittent

---

[78] VGS21630260, EFC000562DC, Ford Motor Company, July 25, 2011.

no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or a check engine light with transmission control module (TCM) diagnostic trouble code…"

194.     Ford's TSB released on January 1, 2011, covering the 2011 Fiesta with the PowerShift Transmission, informs dealers of problems with the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."

195.     Ford's TSB from March 31, 2011, also covering the 2011 Ford Fiesta, informs dealers of problems where the PowerShift Transmission "exhibit[s] a rattle/grind noise in reverse only."

196.     Ford issued two separate TSBs in May 2011, both covering the Ford Fiesta. These TSBs addressed problems with the PowerShift Transmission including "concerns in Drive or Reverse when shifting from Park to Drive or reverse, no engagement, delayed engagement, intermittent engagement, noise during engagement…"

197.     Ford released another TSB in September 2011, which advised dealers to reprogram the transmission computer if 2011 Fiesta owners complained about "hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop."

198.     The 2012 Ford Focus was the subject of a Ford TSB in September 2011, which informed dealers of transmission problems including: "RPM flare on deceleration coming to a stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations at a stop, intermittent vehicle speed control inoperative, intermittent harsh engagement/shift…"

199.     In December of 2011, Motor Trend magazine called these efforts by Ford a "stealth upgrade" and noted that while "[t]here's no official recall or service campaign… anybody who complains or requests an upgrade at the dealership can have their powertrain control computer re-flashed."

200.     The software upgrades recommended and encouraged by the various TSBs issued by Ford were completely ineffective at addressing the Transmission Defects.

201.     At time, when Plaintiff presented the Vehicle to Ford's authorized dealer for repair to the transmission, rather than inform Plaintiff of the Transmission Defects or conclusively repair the problem under warranty, Ford's dealers and authorized repair facilities stated that Vehicle was functioning properly, or performed superficial and ineffectual software updates that delayed or masked the manifestation of the Transmission Defects in an attempt to avoid more comprehensive and expensive repairs or replacements under the warranty.

202.     To this day, Ford still has not publicly acknowledged that the Powershift Transmission suffers from a systemic defect that causes the transmission to malfunction.

## PLAINTIFF'S CLAIMS ARE TIMELY UNDER LAWS OF EQUITY

### All Statute of Limitations Periods are Tolled by the Discovery Rule and by the Doctrine of Fraudulent Concealment

203.     Ford misrepresented the qualities of the transmissions sold to Plaintiff.

204.     Ford concealed from Plaintiff the fact that the transmissions was defective.

205.     Ford continued to misrepresent its ability to repair the Plaintiff's Vehicle in conformity with the warranty throughout the warranty period.

206.     At all relevant times, Ford was aware of the defects in the DPS6.

207.     As described in more detail *supra*, as early as 2010, Ford began issuing significant TSBs to its authorized dealers explaining the widespread issues with the DPS6. At no point prior to the sale of the Vehicle to Plaintiff or during Plaintiff's ownership of the Vehicle did Ford or an authorized Ford dealer ever inform Plaintiff of the ongoing defect, or the fact that Plaintiff's Vehicle was not actually equipped with an automatic transmission.

208.     Ford had a duty to disclose the concealed facts alleged above because Ford knew that

Plaintiff did not know these material facts, and further knew that such facts were not readily accessible to the Plaintiff because Ford actively concealed these facts from Plaintiff.

209. Ford had a duty to disclose the concealed facts alleged above because Ford made misrepresentations in its marketing materials and window stickers and through its authorized sales representatives about the quality, characteristics, and safety of the Powershift Transmission.

210. Ford had a duty to disclose the concealed facts alleged above because Ford actively concealed material facts in order to induce a false belief.

211. Ford intended for Plaintiff to rely on those misrepresentations to conceal the fact that the defective Powershift Transmission could not be repaired.

212. Prior to the sale and lease of the Vehicle to Plaintiff, and at all times thereafter, Ford failed to disclose the existence of the vehicle's inherent defects to Plaintiff, and Ford failed to disclose its inability to repair these inherent defects, which prevented Plaintiff's Vehicle from conforming to its applicable warranties. In effect, after the sale of the Vehicle, Ford fraudulently concealed from Plaintiff, the fact that the Ford authorized dealers were not properly repairing the defects to the DPS6, and knew that the limited work that Ford had authorized its dealerships to perform on the Vehicle would not properly repair it. Ford also continued to conceal the fact that Plaintiff's Vehicle was not in fact equipped with an automatic transmission as advertised.

213. On or around March 27, 2015, in response to complaints about the Transmission Defects to date, Ford issued a TSB to its dealers and authorized repair facilities acknowledging defects in the PowerShift Transmission. Ford's March 27, 2015 TSB, covering the 2013 Ford Focus, informed dealers and service personnel that "FORD 2011-2014 MODEL YEAR FIESTA AND FOCUS VEHICLES EQUIPPED WITH A DPS6 AUTOMATIC TRANSMISSION WILL EXPERIENCE, ON LIGHT ACCELERATION, CLUTCH SHUDDERING."

214. Ford's March 27, 2015 TSB states, unequivocally, that the Vehicle's transmissions will

49

experience transmission shudder on acceleration. This was the earliest known date that Ford made any attempt to notify consumer like Plaintiff through Ford's authorized repair technicians of any of the known defects in the transmission or the implication that the vehicle's transmission was problematic. This date was the earliest date that Plaintiff could have had any sort of notice of the facts that give rise to Plaintiff's fraud cause of action. Ford did not disclose any of this information prior to the sale of the Vehicle to Plaintiff or at any earlier date during ownership. Accordingly, Plaintiff could not have discovered the basis for the claims prior to March 27, 2015. Plaintiff could not, despite reasonable and diligent investigation, have discovered this information on an earlier date because of Ford's fraudulent misrepresentations and concealment of the defects in the DPS6 in Plaintiff's Vehicle, as alleged *supra*.

215.    Additionally, Ford, through its employees, servants and agents repeatedly made false assurances to Plaintiff, upon which Plaintiff reasonably relied. Specifically, Ford represented that it would repair any problems with the transmission in Plaintiff's Vehicle that occurred during the express warranty period, and that the Vehicle and its problems would not be repeating or continue unresolved. Ford's false assurances further delayed Plaintiff's discovery of their claims. The statute of limitations for Plaintiff's claim against Ford was therefore tolled under the delayed discovery rule and the doctrine of fraudulent concealment until Plaintiff could have first discovered that Ford had misrepresented the characteristics of the transmission and concealed the known defects during the ownership of the Vehicle.

216.    Because Ford failed to disclose these foregoing facts to Plaintiff, all statute of limitations periods with respect to sale of the Vehicle was tolled by the doctrines of fraudulent concealment, the discovery rule, and equitable tolling. As alleged herein, Ford wrongfully concealed the fact (1) that the Vehicle was equipped with a manual transmission (the DPS6 PowerShift Transmission), and (2) that Ford's authorized repair dealerships were making inadequate repairs that

were incapable of addressing the root cause of the Vehicle's transmission malfunctions.

217.     Plaintiff did not discover the operative facts that are the basis of the claims alleged herein because the facts were concealed by Ford in confidential and privileged documents, which a consumer would not know about and could not obtain.

218.     No amount of diligence by Plaintiff could have led to the discovery of these facts because they were kept secret by Ford and, therefore, Plaintiff were not at fault for failing to discover these facts earlier.

219.     Plaintiff did not have actual knowledge of facts sufficient to put Plaintiff on notice. Plaintiff did not know, and could not have known, about Ford's inability to repair the defects in the Vehicle's DPS6 PowerShift Transmission because, as alleged above, Ford kept this information highly confidential, and Ford's authorized repair dealership assured Plaintiff that its repairs were effective.

**ALL STATUTE OF LIMITATIONS ARE TOLLED BY THE TOLLING DOCTRINE ESTABLISHED IN *AMERICAN PIPE & CONSTRUCTION CO. V. UTAH*, 414 U.S. 538 (1974) AS A RESULT OF THE CLASS ACTION *VARGAS V. FORD MOTOR COMPANY***

220.     Plaintiff gave timely notice of their claims against Ford in the present action as putative class members in a class action styled *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), which was filed on September 28, 2012. That action was filed within three years of the date of Plaintiff's discovery of the claims against Ford in the present action, as previously described in detail above.

221.     There is no prejudice to Ford in gathering evidence to defend against Plaintiff's individual claims because the class definition in the class action complaint, within which Plaintiff was a putative class member, and the allegations in the class action lawsuit, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) ("*Vargas*"), put Ford on notice of the facts that give rise to Plaintiff's action, the witnesses necessary for Ford to defend Plaintiff's action, and the causes of action against Ford asserted in Plaintiff's action.

222.     *Vargas* alleged the material facts on behalf of Plaintiff as a putative class member as are being alleged by Plaintiff herein.

223.     The facts alleged in *Vargas* are substantially similar, if not identical, to the facts alleged herein.

224.     The allegations in *Vargas* are based on the same subject matter and similar evidence as the instant complaint. Those allegations concern the same evidence, memories, and witnesses as the subject matter in the instant complaint.

225.     The *Vargas* class action protected the efficiency and economy of litigation because that class action protected the rights of thousands of consumers nationwide through a single action.

226.     The tolling of Plaintiff's individual statute of limitations encourages the protection of efficiency and economy in litigation as promoted by the class action devise, so that putative class members would not find it necessary to seek to intervene or to join individually because of fear the class might never be certified or putative class members may subsequently seek to request exclusion.

227.     The running of all statute of limitations on Plaintiff's claims asserted against Ford in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of *Vargas* (*i.e.*, from the date *Vargas* was filed on September 28, 2012 to the date on which Plaintiff filed the instant action.

## FIRST CAUSE OF ACTION
### Breach of Express Warranty, 810 Ill. Comp. Stat. 5/2-313

228.     Plaintiff incorporates by reference all facts and allegations set forth in this Complaint.

229.     Plaintiff's purchase or lease of the Vehicle was accompanied by an express warranty under 810 Ill. Comp. Stat. 5/2-313, written and otherwise offered by Ford, whereby said warranty was part of the basis of the bargain of upon which Plaintiff relied.

230.     Plaintiff's Vehicle constitutes goods.

231.     Plaintiff's Vehicle was not as warranted and represented in that the Vehicle had Transmission Defects (as defined *supra*), as well as defects or conditions as reflected in the various repair orders, TSBs, special service messages, recall documents and consumer complaints in Ford's possession.

232.     As a result of the Transmission Defects in the Vehicle, Plaintiff cannot reasonably rely the car for the ordinary and intended purpose of providing safe, reliable, and efficient transportation.

233.     As a result of the Transmission Defects, Plaintiff suffered significant diminution in the value of the Vehicle.

234.     Plaintiff provided Ford with sufficient opportunities to repair or replace the Vehicle.

235.     Plaintiff reasonably met all obligations and pre-conditions as provided in the express warranty that accompanied the Vehicle.

236.     Ford breached its express warranties by failing to adequately repair the Vehicle or to repair the Vehicle in a timely fashion, and the Vehicle remain in a defective condition at the time of this filing.

237.     The Vehicle's defects have rendered the limited warranty ineffective to the extent that the limited repair and/or adjustment of defective parts failed its essential purpose, pursuant to 810 Ill. Comp. Stat. 5/2-313.

238.     The Vehicle continues to contain defects which substantially impair its use and value to Plaintiff.

239.     These defects and non-conformities could not reasonably have been discovered by Plaintiff prior to acceptance of the Vehicle.

240.     Ford induced Plaintiff's acceptance of the Vehicle by agreeing, by means of the express warranty, to remedy, within a reasonable time, those defects which had not been or could not have been discovered prior to acceptance and, further, by Ford's failure to disclose the aforesaid

Transmission Defects and/or Ford's active concealment of same.

241.     As a result of the Transmission Defects, the Plaintiff have lost faith and confidence in the Vehicle, Plaintiff cannot reasonably rely upon the Vehicle for the ordinary and intended purpose of safe, reliable and efficient transportation.

242.     As a result of Ford's breaches of express warranties, Plaintiff suffered the damages set forth herein.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter a judgment against Ford granting the following relief:

      a.     Declare that acceptance has been properly revoked by Plaintiff and for damages incurred in revoking acceptance or, alternatively, damages in the amount Plaintiff is found to be entitled;

      b.     A refund of the purchase price paid by Plaintiff for the Vehicle;

      c.     Incidental, consequential and actual damages;

      e.     Costs, interest, and actual attorney fees; and

      f.     Such other relief this Court deems just and equitable.

### SECOND CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability
### 810 Ill. Comp. Stat. 5/2-314

243.     Plaintiff incorporates by reference all facts and allegations set forth in this Complaint.

244.     Ford is a merchant with respect to motor vehicles, including the subject Vehicle.

245.     The Vehicle was subject to implied warranties of merchantability under 810 Ill. Comp. Stat. 5/2-314.

246.     The Vehicle was not fit for the ordinary purpose for which such goods are used and/or

the Vehicle would not pass without objection in the trade for the product description.

247.     The Transmission Defects and problems hereinbefore described rendered the Vehicle unmerchantable.

248.     Ford failed to adequately remedy the Transmission Defects in the Vehicle within a reasonable time, and the Vehicle continues to be in unmerchantable condition at the time of filing this Complaint.

249.     As a result of Ford's breaches of implied warranties, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter a judgment against Ford granting the following relief:

a.     Declare that acceptance has been properly revoked by Plaintiff and for damages incurred in revoking acceptance or, alternatively, damages in the amount Plaintiff is found to be entitled;

b.     A refund of the purchase price paid by Plaintiff for the Vehicle;

c.     Incidental, consequential and actual damages;

e.     Costs, interest, and actual attorney fees; and

f.     Such other relief this Court deems just and equitable.

### THIRD CAUSE OF ACTION
### Violation of Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*

250.     Plaintiff incorporates by reference all facts and allegations set forth in this Complaint.

251.     Plaintiff is a consumer as defined in 15 U.S.C. § 2301(3).

252.     Ford is a supplier and warrantor as defined in 15 U.S.C. § 2301(4)(5).

253.     The Vehicle is a consumer products as defined in 15 U.S.C. § 2301(6).

254.     The Vehicle was delivered subject to a written warranty and/or a service contract as

those terms are defined in 15 U.S.C. § 2301(6) and 2301(8), respectively.

255.     15 U.S.C. § 2301(a)(1), requires Ford, as warrantor, to remedy any defect, malfunction or nonconformance of the Vehicle within a reasonable time and without charge to Plaintiff, as defined by 15 U.S.C. § 2304(d).

256.     In connection with the aforesaid transmission defects, which occurred during the time and mileage parameters of Ford's written express warranty, Ford failed to adequately repair same under the warranty within a reasonable time.

257.     15 U. S.C. §2310(d)(1) permits Plaintiff to bring an action against Ford for any breach of express or implied warranty arising under state law, as well as any violation of the Act.

258.     15 U.S.C. § 2308(a) prohibits Ford from disclaiming the implied warranty of merchantability and 15 U.S.C. §2308(c) renders any attempted disclaimer invalid.

259.     Plaintiff had sufficient direct dealings with either Ford or its agents to establish privity of contract between Ford on one hand and Plaintiff on the other hand.

260.     Ford authorized dealerships and technical support organizations operating under contract with Ford are agents of Ford. Notwithstanding, privity is not required here because Plaintiff is an intended third-party beneficiaries of contracts between Ford and its dealers. Ford dealerships were not intended to be the ultimate consumer of the Vehicle and have no rights under the warranty agreements provided with the Vehicle.

261.     The subject warranty agreements were designed for and intended to benefit the Plaintiff only.

262.     Even though Plaintiff complied with all conditions precedent, Ford has failed and/or refused to remedy within a reasonable time and without charge, the Transmission Defects.

263.     Giving Ford a reasonable opportunity to cure its breach of its written warranties would be unnecessary and futile in this case. Plaintiff have already done so, and Ford has failed, after

numerous attempts, to cure the defects. At the time of the sale of the Vehicle, Ford knew, should have known, or was reckless in not knowing, of its omissions and/or misrepresentations concerning the DPS6 PowerShift Transmission's inability to perform as warranted, but it nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiff resort to an informal dispute resolution procedure and/or give Ford a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

264. Further, Ford's warranty states that resort to its informal settlement dispute procedure administered by the Better Business Bureau is optional, to-wit:

## 2. Important information you should know

### IF YOU NEED CUSTOMER ASSISTANCE

Your Ford Motor Company dealer is available to assist you with all your automotive needs. Please follow the procedures outlined on the front page of this booklet.

In addition, if you are an eligible U.S. owner, you may use - at no cost - the services of the BBB AUTO LINE program. For details, see Better Business Bureau (BBB) AUTO LINE program, page 33 or call 1-800-955-5100.

*See* Ford Warranty Book Excerpts. Therefore, pre-suit resort to the BBB Auto Line program is not required. *See* 16 C.F.R. § 703(b)(3) and 16 C.F.R. § 701.01(j)(2).

265. As a result of Ford's breaches of express and implied warranties, Ford's failure to remedy same within a reasonable time and without charge to Plaintiff, and Ford's other violations of the Act, as set forth in this Complaint, Plaintiff suffered the damages set forth herein.

266. Plaintiff would suffer economic hardship if Plaintiff returned the Vehicle but did not receive the return of all payments made. Because Ford is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff has not re-accepted the Vehicle by

retaining it.

267.    The amount in controversy of this action exceeds the sum of $75,000.00, exclusive of interest, costs and attorney fees, computed based on all claims to be determined in this lawsuit.

268.    Plaintiff seek all damages permitted by law, including diminution in value of the Vehicle and/or loss of the benefit of the bargain, in an amount to be proven at trial.

**WHEREFORE**, Plaintiff prays that this Honorable Court enter its Order requiring Ford to accept return of the Vehicle and refund Plaintiff's purchase price, together with taxes, insurance premiums, interest, costs and actual attorney fees as provided by 15 U.S.C. § 2310(d)(2) or in the alternative, that Plaintiff be awarded damages in the amount Plaintiff is found to be entitled, plus interest, costs and actual attorney fees.

## FOURTH CAUSE OF ACTION
## VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT, R.C. § 1345.01, *et seq.*

269.    Plaintiff incorporates by reference all facts and allegations set forth in this Complaint.

270.    The Ohio Consumer Sales Practices Act, Ohio Revised Code § 1345.01, *et seq.,* ("CSPA") prohibits unfair or deceptive acts or practices in connection with a consumer transaction.

271.    At all times relevant, Debra Schweizer was a "consumer," as defined by the CSPA.

272.    At all times relevant, the facts as set forth herein, effect a "consumer transaction," as defined by the CSPA.

273.    At all times relevant, Ford's actions and omissions in connection with the Vehicle, as forth herein, was unfair and deceptive to Plaintiff.

274.    At all times relevant, Ford's breach of its express and implied warranties, as set forth herein, was unfair and deceptive to Plaintiff.

275.    At all times relevant, Ford's fraud and concealment, as set forth herein, was unfair and deceptive to Plaintiff.

276.     As a result of claims and allegations set forth herein, *inter alia*, before, during, or after a consumer transaction involving or effecting Plaintiff, Ford committed one or more unfair and deceptive acts.

**WHEREFORE**, Plaintiff prays for Judgment against Ford in whatever amount Plaintiff are found to be entitled, together with equitable relief, actual and/or statutory damages, interest, costs, and reasonable attorney fees as provided by statute.

**FIFTH CAUSE OF ACTION**
**Fraud by Misrepresentation and Concealment**

277.     Plaintiff incorporates by reference all facts and allegations set forth in this Complaint.

278.     Ford committed fraud by selling the Vehicle to Plaintiff without disclosing that the Vehicle and its DPS6 PowerShift Transmissions were defective and susceptible to sudden and premature failure.

279.     Prior to Plaintiff's acquisition of the Vehicle, Ford was aware and knew that the PowerShift Transmission installed on the Vehicle were defective, but Ford concealed this fact from Plaintiff at the time of sale and thereafter.

280.     Ford knew or should have known that the PowerShift Transmission had the Transmission Defects, which presents a safety hazard and is unreasonably dangerous, because it can suddenly and unexpectedly affect the ability to control the vehicle's speed, acceleration, and deceleration.

281.     Ford acquired its knowledge of the Transmission Defects prior to Plaintiff acquiring the Vehicle, through sources not available to consumers such as Plaintiff, including but not limited to pre-production and post-production testing data, early consumer complaints about the Transmission Defects made directly to Ford and its network of dealers, aggregate warranty data compiled from Ford's network of dealers, testing conducted by Ford in response to these

complaints, as well as warranty repair and part replacements data received by Ford from Ford's network of dealers, amongst other sources of internal information.

282.　　While Ford knew about the Transmission Defect, and its safety risks since 2010, if not before, Ford concealed and failed to disclose the defective nature of Plaintiff's Vehicle and its PowerShift Transmissions to Plaintiff at the time of sale and thereafter.

283.　　Had Plaintiff known that their Vehicle suffered from the Transmission Defects, Plaintiff would not have purchased the Vehicle.

284.　　Indeed, Plaintiff alleges that Ford knew that the Vehicle and its PowerShift Transmissions suffered from an inherent defect, was defective, would fail prematurely, and was not suitable for its intended use.

285.　　Ford was under a duty to Plaintiff to disclose the defective nature of the Vehicle and its PowerShift Transmission, its safety consequences and/or the associated repair costs because:

> A.　　Ford acquired its knowledge of the Transmission Defects and its potential consequences prior to Plaintiff acquiring the Vehicle, though sources not available to consumers such as Plaintiff, including but not limited to pre-production testing data, early consumer complaints about the Transmission Defects made directly to Ford and its network of dealers, aggregate warranty data compiled from Ford's network of dealers, testing conducted by Ford in response to these complaints, as well as warranty repair and part replacements data received by Ford from Ford's network of dealers, amongst other sources of internal information;

> B.　　Ford was in a superior position from various internal sources to know (or should have known) the true state of facts about the material defects contained in vehicles equipped with PowerShift Transmission; and

C.      Plaintiff could not reasonably have been expected to learn or discover of the Vehicle's Transmission Defects and its potential consequences until well after Plaintiff purchased the Vehicle.

782.      The facts concealed or not disclosed by Ford to Plaintiff are material in that a reasonable person would have considered them to be important in deciding whether to purchase the Vehicle. Had Plaintiff known that the Vehicle and its transmissions were defective at the time of sale, Plaintiff would not have purchased the Vehicle.

783.      Plaintiff is a reasonable consumers who did not expect the transmissions to fail and not work properly. Plaintiff further expected and assumed that Ford would not sell vehicles with known material defects, including but not limited to those involving the Vehicle's transmissions, and would disclose any such defect to its consumers before selling such vehicles.

784.      As a result of Ford's misconduct, Plaintiff suffered and will continue to suffer actual damages.

785.      Ford repeatedly and publicly represented that its PowerShift Transmissions provided superior function, utility, reliability and other benefits and characteristics, to-wit: "PowerShift with dry-clutch facings and new energy saving electromechanical actuation for clutches and gear shifts saves weight, improves efficiency, increases smoothness, adds durability, and is sealed with law-friction gear lubricant for the life of the vehicle. This transmission requires no regular maintenance."

786.      Ford further represented that its PowerShift Transmission was an "option" that was worth paying upwards of $1,000 per vehicle over and above the equivalent vehicles equipped with manual transmissions and/or automatic transmissions without PowerShift technology.

787.      Ford's representations were expected and intended to induce Plaintiff to purchase the Vehicle equipped with PowerShift Transmissions and to pay the increased price for same.

788.      Ford further withheld and continues to withhold information concerning the

Transmission Defects set forth herein, and affirmatively misrepresented and continues to misrepresent the above described symptoms as being "normal," when Ford knew and continue to know that its representations and omissions are misleading and, in fact, Ford intended its representations and omissions to mislead Plaintiff concerning the nature and existence of the above described Transmission Defects.

789.     Plaintiff reasonably relied on Ford's representations and omissions; in doing so, Plaintiff was deceived into purchasing the Vehicle at a price far greater than the values that would have been assigned to it had the Transmission Defects and dangers been disclosed; further, Ford's representations and omissions deceived Plaintiff concerning the existence of the defects and Plaintiff's rights and remedies with respect to the Transmission Defects.

790.     Had Plaintiff known of the true nature of the Transmission Defects, Plaintiff would not have purchased the Vehicle or, alternatively, would not have paid the contract.

791.     Ford's representations and omissions as herein alleged were undertaken as an affirmative scheme designed to prevent Plaintiff from obtaining information about the nature and existence of the claims involving their Vehicle's defective PowerShift Transmissions. In furtherance of this scheme, Ford also represented to Plaintiff that the symptoms described above were "normal," or were somehow the fault of the Plaintiff, or that the problems had been repaired. All of these statements were false and made with the intent to deceive and mislead Plaintiff, who relied on the statements to Plaintiff's detriment by failing to secure multiple repairs often required to substantiate claims and submit said claims earlier.

**WHEREFORE**, Plaintiff prays that this Honorable Court enters Judgment against Ford for compensatory and punitive damages, in whatever amount above $75,000.00 Plaintiff is found to be entitled, together with interest, costs and attorney fees, plus such other and further relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury in this action.


Respectfully submitted,

WELLS LAW OFFICE, INC.

BY: /s/ Amy L. Wells
AMY L. WELLS, Ohio Bar No. 0078247
201 N. Garland Ct., 2908
Chicago, IL 60601
(773) 762-9104
attorneyamywells@gmail.coms


STERN LAW, PLLC

BY:/s/ Kenneth A. Stern
    KENNETH A. STERN
*Pro Hac Vice,* to be filed
41850 W. Eleven Mile Road, Suite 121
Novi, MI 48375-1857
(248) 347-7315
ken@sternlawonline.com

63